STATE OF OHIO, *ex rel.*,
MICHAEL DeWINE,
OHIO ATTORNEY GENERAL,

       Plaintiff,

      v.

JOHN G. BREEN, *et al.*,

      Defendant.

Case No. 2:16-cv-802
Chief Judge Edmund A. Sargus, Jr.
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

This matter is before the Court for consideration of the Motion for Partial Summary Judgment of Plaintiff State of Ohio, ex rel. Michael DeWine, Ohio Attorney General (the "State") (ECF No. 116); the Motion for Summary Judgment of Defendants John G. Breen, John E. Breen, and Janice L. Breen (collectively the "Breens") (ECF No. 117); Defendant Trabue Dublin, LLC's ("Trabue") Motion for Summary Judgment (ECF No. 118); the State's Response in Opposition to the Motions for Summary Judgment of the Breens and Trabue (ECF No. 123); Trabue's Response in Opposition to the Breens' Motion for Summary Judgment (ECF No. 124); Trabue's Response in Opposition to the State's Motion for Summary Judgment (ECF No. 126); the Breens' Response in Opposition to the State's Motion for Summary Judgment (ECF No. 127); the State's Reply (ECF No. 132); Trabue's Reply (ECF No. 134); and the Breens' Reply. (ECF No. 135.) For the reasons below, the Court **GRANTS in PART** and **DENIES in PART**.

# I. BACKGROUND

## A. Undisputed Facts

### 1. Defendants' Ownership and Operation of the Properties

This case involves two properties: one commercial and one residential. Pl.'s Ex. 3, Expert Report by Robin Roth at 2 ("Roth Report") (ECF No. 116-2). In 1980, the owner and President of Buckeye Terminix Company, Inc. ("Buckeye"), John G. Breen, and his wife, Janice Breen, purchased the commercial property at 2121 Riverside Drive, Upper Arlington, Ohio (the "Site") in their own names. 1980 Breen Deed; Dep. of John E. Breen ("Breen Dep.") at 18:21–23 (ECF No. 119-1). Buckeye was located at the Site from at least 1980 to 2002. Breen Dep. 19:22–20:8. Buckeye provided extermination services around Ohio from 1957 to 2002. Breen Dep. at 17:16–18:4.

The Site housed Buckeye's building, which had an office space and a connected garage. Roth Report at 14–15. That building has always been surrounded by parking areas and driveways. *Id.*; Pl.'s Ex. 4, Dep. of Deborah Strayton ("Strayton Dep.") at 139:1–9 (ECF No. 116-2). Immediately west of the Site, down a steep embankment, is a tract of five land plots addressed to Scioto Pointe Lane (the "Neighboring Properties"). Roth Report at 3–4.[1]

From 1980 until at least 1987, Buckeye maintained pesticides at the Site for its extermination business. Pl.'s Ex. 5, Director's Final Findings and Orders at ¶ 2 ("1992 Director Orders") (ECF No. 119-1); Breen Dep. at 42:15–21. Buckeye employees used the garage space and outdoor areas to mix, transfer, and store chlordane, aldrin, heptachlor, and dieldrin. 1992 Director Orders at ¶ 2; Roth Report, Ex. 3–4. Buckeye employees also loaded, unloaded, and

---

[1] In 1981, the Neighboring Properties were part of a larger 38-acre tract owned by the Kaufman Investment Company. Trabue Ex. 6, Deed from Herman H. Hall, et al. to the Marble Cliff Quarries Company, February 28, 1923.

washed trucks containing pesticides at the facility, and they dumped pesticide-laden water at the Site and onto the western embankment. Roth Report, Ex. 3–4.

From 1980 to 2002, John G. Breen served as President/General Manager of Buckeye and as the President of its Board of Directors. Breen Dep. at 18:17–19:15, 30:18–20. He also managed Buckeye's finances. *Id.* Janice was Safety Director and served as Secretary of the Board of Directors. Pl.'s Ex. 7, 1987 Buckeye Terminix Company Certificate of Amendment ("1987 Amendment"); Breen Dep. at 19:12–15. Starting around 1980, John G. and Janice Breen were the majority owners of Buckeye. Breen Dep. at 17:12–18:4. In 1987, John E. Breen, son of John G. and Janice Breen, also gained ownership in Buckeye. *Id.* In 1992, John E. Breen became Buckeye's General Counsel and Vice President. Breen Dep. at 19:7–10.

In December 1985, Specialty Restaurant Corporation ("Specialty"), Trabue's parent company, purchased the Neighboring Properties. Trabue Ex. 7, Deed from Kaufman to Specialty, Dec. 23, 1985. In 2010, Specialty created Trabue Dublin, LLC, then sold the Neighboring Properties to Trabue for a nominal price. Trabue Ex. 9 (ECF No. 118-13).

## 2. Environmental Issues

In 1981, Buckeye employees complained to the Ohio Environmental Protection Agency (the "OEPA") about pesticide-dumping at the Site. Roth Report at 5. In response, the OEPA's Office of Emergency Response staff collected two soil samples from the Site. Roth Report at 5; Trabue Ex. 4, Ltr. to J.G. Breen from W. Nichols, July 10, 1981 (ECF No. 118-8). Those samples showed concentrations of chlordane between 5,780 and 5,920 parts per million ("ppm"). *Id.*

In a letter dated July 10, 1981, the OEPA notified Buckeye that its hazardous disposal was illegal and violated Ohio law. *Id.* In the letter, the OEPA requested that Buckeye implement

measures to prevent further releases of pesticides into the environment. *Id.* Because of the OEPA's letter, Buckeye installed a drainage collection system, paved its parking lot with asphalt, maintained the vegetated area at the embankment, and allowed the OEPA to monitor the Site. Trabue Ex. 5, Ltr. to J.G. Breen from W. Nichols, Dec. 16, 1981; 1992 Director Orders at 2; Breen Dep. at 37:23–38:9.

The OEPA continued sampling soil, gravel, and water runoff at Site in 1981, 1982, and 1989. Roth Report at 5. Each time, the OEPA found aldrin, chlordane, and dieldrin, among other pesticides. *Id.* In 1988, Buckeye excavated the storage tank from the Site. 1992 Director Orders at ¶ 3; Breen Dep. at 37:23–38:9.

In 1991, a developer interested in purchasing the 38-acre tract, which included the Neighboring Properties, hired a consulting firm, Geraghty & Miller ("G&M"), to investigate the land's environmental conditions. Trabue Ex. 1, Tallichet Affidavit at ¶ 7. G&M discovered that a portion of the 38-acre tract had been contaminated by Buckeye's pesticide operations. Trabue Ex. 8, *Specialty Restaurants Corp. v. Kaufman Investment Co., et al.*, No. C2-96-342, Findings of Fact and Conclusions of Law at 5 (S.D. Ohio Jan. 5, 1998) (the "Graham Order"). Until 1991, Specialty was not aware of any environmental issues related to the Neighboring Properties. Tallichet Affidavit at ¶ 7. Subsequently, Buckeye engaged G&M to sample soil and groundwater at the Site and at the Neighboring Properties. Strayton Dep., Ex. H at 3. In 1991, G&M collected ground and groundwater samples from the Neighboring Properties. *Id.*; Roth Report at 6–7. These samples contained aldrin, chlordane, dieldrin, and other pesticides. *Id.* G&M implemented Method 8080 when analyzing the soil and ground water samples. *Id.* On May 20, 1992, Specialty entered an agreement with the OEPA and Buckeye, allowing access to

the Neighboring Properties to investigate and remediate the contaminations. Trabue's Mot. for S.J., Ex. G, Attach. D, Access Agreement, May 20, 1992.

On June 26, 1992, the OEPA Director Donald Schregardus issued a Director's Final Findings and Orders ("1992 Director Orders"). 1992 Director Orders. The 1992 Director Orders applied to and bound "Buckeye Terminix, Inc. ('Respondent'), its officers and directors in their corporate capacity, agents, assigns, and successors in interest."[2] 1992 Director Orders at 1. In the 1992 Director Orders, the OEPA determined that Buckeye used pesticides at the Site until at least 1987. 1992 Director Orders at ¶ 3. Those pesticides included chlordane, aldrin, heptachlor, and dieldrin. 1992 Director Orders at ¶ 3. The 1992 Director Orders state "[Buckeye] disposed of hazardous wastes at the Facility, and has placed or caused to be placed industrial wastes or other wastes in a location where they cause or threaten to cause pollution of the waters of the state." 1992 Director Orders at ¶ 10. The 1992 Director Orders would terminate upon Buckeye: (i) proving to the OEPA that all tasks had been completed, (ii) paying the OEPA's oversight costs, and (iii) demonstrating that the remaining contamination met the OEPA's acceptable risk levels. 1992 Director Orders at 12; Ex. 13, Ltr. To John E. Breen from D. Tjoelker, June 21, 1996.

By 1992, John E. Breen was managing Buckeye's environmental issues. Strayton Aff. at ¶ 6. He negotiated the 1992 Director Orders. *Id.* John E. Breen also hired and oversaw environmental consultants, ordered samples and forwarded the results to the OEPA, ensured the Neighboring Properties were accessible, arranged for remedial equipment and supplies, and worked with Buckeye's insurance carriers to pay for remedial work outlined in the 1992 Director

---

[2] The 1992 Director Orders did not identify Specialty, then the owner of the Neighboring Properties, as a responsible party for the contamination.

5

Orders. Pl.'s Ex. 11, J. E. Breen Letter to OEPA, June 8, 1992; Pl.'s Ex. 12, J. E. Breen Letter to OEPA; Strayton Aff. at ¶ 6; Breen Dep. at 86:1–88:6.

In July 1992, G&M conducted additional soil and ground water sampling at four monitoring wells, which were installed on the Neighboring Properties. Roth Report at 7. Based on the results of those samples, G&M submitted an interim action report (the "Interim Remedy"). *Id.* In December 1992, G&M presented its investigatory results and Interim Remedy to the OEPA. Strayton Dep., Ex. H. G&M confirmed the presence of pesticides in soil and groundwater at the Neighboring Properties but concluded that the groundwater contamination posed no threat to human health or the environment at 39 of the 44 lots in the neighboring subdivision, which were therefore suitable for residential development. *Id.* at 12–13; 40–41. G&M determined that contamination levels at Lots 40, 42, and 43[3] exceeded residential levels, but that the contamination would naturally degrade to acceptable levels by 1996. *Id.* at 44. G&M recommended that if Specialty planned to develop the 39 unaffected lots, it should enhance the vegetative growth at Lots 42 and 43 to minimize any potential exposure at the non-contaminated lots. *Id.* at 43. The Interim Remedy also recommended that Buckeye sample the soil in two to four years to determine whether the level of pesticide contamination was actually decreasing, and to ensure the integrity of the cover material placed over the contamination. *Id.*

On March 24, 1993, the OEPA approved G&M's Interim Remedy with a revised "Recommended Remedial Actions" section, which recommended revegetation at the contaminated area, unless affected lots were to be developed, in which case installation of a soil cover was recommended to eliminate potential exposure to the hazardous substances. Trabue

---

[3] These lots were originally designated 34, 35, 37, and 38, but were later renumbered to 39, 40, 42, and 43, respectively. *See* Trabue Ex. 1, Affidavit of John D. Tallichet at ¶ 2 (ECF No. 118-2). The Court will refer to the lots' updated numbers.

Ex. 10, Ltr. to J.E. Breen from D. Tjoelker (ECF No. 118-14). Upon the OEPA's approval of the Interim Remedy, Specialty agreed to notify Buckeye before selling or developing the four lots with pesticide contamination. *Id.*

On January 25, 1995, Specialty sold the entire 38-acre tract, except for lots 39, 40, 42, and 43. Trabue Ex. 11 (ECF No. 118-15). After selling the non-contaminated lots, the purchaser developed the private residential subdivision, known as Scioto Pointe. Trabue Ex. 12, Field Activity Rep. of D. Tjoelker, Dec. 5, 1995 (ECF No. 118-16).

In May 1995, the OEPA sent a letter ("May 1995 Letter") to John E. Breen to document telephone conversations on the development properties occurring at the Site and the Neighboring Properties Trabue Ex. 12, Ltr. to J. E. Breen from D. Tjoelker (ECF No. 118-17). The May 1995 Letter outlined Buckeye's obligations under the 1992 Director Orders, including the requirement that Buckeye or its officers implement the remedial actions described in the Interim Remedy. *Id.* The letter also notified Buckeye that it had 30 days to submit a workplan for the design and installation of a soil over the contaminated portion of the Neighboring Properties. *Id.* Further, the May 1995 Letter reminded Buckeye that the OEPA would evaluate the sampling data, quality assurance, and laboratory reports, once the OEPA received that information from Buckeye. *Id.* Finally, the letter notified Buckeye that if the pesticide contaminant concentrations met acceptable residential risk goals, then Buckeye would not be obligated to implement the soil cover that the OEPA previously recommended. *Id.*

On May 29, 1995, John E. Breen sent the OEPA a remedial action plan for the Neighboring Properties. Pl.'s Ex. 13, May 1995 Ltr. from J. E. Breen (ECF No. 116-2). On June 7, 1995, John E. Breen sent the test results soil samples to the OEPA. Roth Report at 9. A&L Great Lakes Laboratories ("A&L") performed the laboratory analysis using Food and Drug

7

Administration ("FDA") methods. *Id.* On June 9, 1995, the OEPA sent John E. Breen a letter, which expressed the OEPA's concern regarding A&L's improper FDA methodology and explained that the proper methodology is the EPA-approved Method 8080. *Id.* Then, on June 12, 1995, the OEPA collected soil samples from the Neighboring Properties for comparison with the samples that John E. Breen had previously sent. *Id.* Ross Analytical Services, Inc. analyzed the soil samples for the OEPA using Method 8080 and determined that maximum concentrations of pesticides still exceeded remedial goals. *Id.* at 10.

In a letter dated June 21, 1996, the OEPA notified Buckeye that a developer, H.R. Ransom, intended to pursue residential development of Lot 42. Trabue Ex. 13 at 1 (ECF No. 118-17). The letter also explained that future soil sampling plans were required within two to four years and that Buckeye was obligated to submit a sampling plan and the name of the selected lab. *Id.* at 1. Further, the OEPA notified Buckeye that while the Neighboring Properties' uncontaminated lots underwent residential development, Buckeye was required to ensure the integrity of the cover material and to implement landscaping and vegetation actions. *Id.* Finally, the OEPA updated Buckeye on the status of the 1992 Director Orders, stating:

> To date, Buckeye Terminix has completed the field investigation, risk assessment, and investigation report. Implementation of the remedy is ongoing. The cover material is in place and vegetation activities are yet to be completed. Final termination of the order ... will occur once Buckeye Terminix has shown that all tasks of the statement of work and payment of Ohio EPA oversight costs have been completed and certified in writing. Completion of the remedy will occur once contamination meets acceptable risk levels and [Lot 42] is released for development.

*Id.* at 2. In response, John E. Breen sent to the OEPA a letter dated July 15, 1996, which requested delaying any sampling at Lot 42 until June 1998 to allow more time for natural degradation of the pesticides. Roth Report at 10.

8

In 2001, John G. and Janice Breen transferred title of the Site to the John G. and Janice Breen Trusts. Trabue Ex. 25 (ECF No. 118-29); Answers of John G., Janice, and John E. Breen, ECF Nos. 12, 13, 14 at ¶ 1. In 2008, the John G. Breen Living Trust sold the Site to Donald Dick ("Dick"). Pl.'s Ex. 6 (ECF No. 116-2); Trabue Ex. 24 (ECF No. 118-28). John G. and Janice Breen received the proceeds of that sale. Breen Dep. at 33:3–14.

In 2002, the Breens sold Buckeye and ceased operations. Breen Dep. at 24:3–25:3. The Breens sold Buckeye's assets to the franchisor, Terminix International, and then changed Buckeye's name to BTX Enterprises.[4] Breen Dep. at 24:3–25:3; 27:15–18, 30:12–17. The Breens divided the proceeds of the sale—about $3–4 million—between John G. Breen and John E. Breen. Breen Dep. at 27:15–28:10, 63:21–64:11. After Buckeye sold its assets and began winding down, John E. Breen continued to work with the OEPA as Buckeye's representative. Pl.'s Ex. 14, J. E. Breen Letter to OEPA, April 29, 2002 (ECF No. 116-2).

On February 7, 2002, the OEPA sent a letter to John E. Breen and Buckeye, requesting a workplan for sampling soils from Lot 42. Roth Report at 11. The letter notified Buckeye that the workplan was due in 60 days. *Id*. Further, the letter explained that, upon the OEPA's approval of a proposed workplan, Buckeye needed to implement the approved workplan so that the OEPA could test the soil and then compare the results to cleanup goals. *Id*. John E. Breen responded with a letter dated April 29, 2002, which explained that Buckeye no longer operated. Pl.'s Ex. 14 (ECF No. 116-2). The letter also notified the OEPA that John E. Breen would still initiate a final soil sampling event. *Id*.

Then, on June 29, 2002, John E. Breen sent to the OEPA a letter that proposed protocols for the soil testing and analysis at Lot 42. Breen Dep., Trabue Ex. 6 (ECF NO. 119-1). Those

---

[4] For ease of reference, the Court uses "Buckeye" to describe Buckeye Enterprises and BTX Enterprises, since the company's name change is immaterial.

9

proposed protocols detailed the required sample depths, materials, transportation, and storage qualifications. *Id.* The OEPA responded with a letter to John E. Breen that reviewed the proposed protocols. Roth Report at 11. The OEPA's response letter required that contractors implement Method 8080. *Id.* Further, the letter required John E. Breen ensure that the tests: (1) indicated the number of samples to be collected and submitted for laboratory analysis from discrete hotspot locations; (2) implemented Method 8080, or otherwise the Breens needed to allow the OEPA to split sample; and (3) field-verified that the samples consisted of the original soil surface. *Id.* at 11–12.

On February 21, 2003, John E. Breen delivered a report ("2003 Report") to the OEPA. Breen Dep., Ex. 6; Roth Report at 12. The 2003 Report detailed the results of soil sampling and chlordane analysis of Lot 42 in 1992, 1995, and 2002. Trabue Ex. 18 (ECF No. 118-22). Upon reviewing the 2003 Report, the OEPA notified John E. Breen that the OEPA denied the soil sampling results because Buckeye and its consultants implemented the unapproved FDA analytical method, rather than Method 8080 (or the updated 8081A). Trabue Ex. 19 (ECF No. 118-23).

In December 2003, the OEPA collected soil samples from the Neighboring Properties. *Id.* The maximum concentrations that the OEPA detected still exceeded permissible levels. *Id.* While collecting soil samples, investigators discovered a partially buried 55-gallon drum, which contained trace amounts of hazardous substances. Breen Dep. at 49:8–13, 51:10–11; Trabue Answer, ECF No. 20 at ¶ 16. In 2003, John E. Breen personally hired an environmental consultant to remove that drum. Ex. 15 to Pl.'s Mot. for Summ. J. The OEPA never asked Specialty to remove the drum found on the Neighboring Properties because Specialty was "not subject to the [1992 Director Orders]." Strayton Deposition at 56:11–16.

After 2004, John E. Breen stopped responding to the OEPA. Strayton Aff. at ¶¶ 9–11; Breen Dep. at 54:17–22. On February 6, 2007, the Ohio Secretary of State cancelled Buckeye's standing. John G. Breen Aff. at ¶ 1.

Concerned about the status of the Neighboring Properties, Specialty contacted Douglas Crandall ("Crandall"), the OEPA Site Coordinator. Crandall Dep. at 47:9–48:20 (ECF No. 119-18). Crandall suggested that Specialty perform another round of sampling. *Id.* On June 18, 2008, Specialty hired Hull & Associates, Inc. ("Hull") to collect soil samples from the Neighboring Properties. Roth Report at Ex. 15–16. Upon analyzing the samples, Hull concluded that maximum concentrations exceeded acceptable residential risk levels. Roth Report at 13. Upon determining the pesticides were not degrading as quickly as originally expected, the OEPA sent John E. Breen multiple letters from 2008 to 2011. Breen Dep. at 53:11–17; Strayton Aff. at ¶¶ 9–11; Trabue Ex. 21 (Ex. 118-25). John E. Breen never responded. Breen Dep. at 53:11–17, 54:17–22; Strayton Aff. at ¶¶ 9–11.

In 2010, Specialty created Trabue, which purchased the Neighboring Property from Specialty for a nominal price. Pl.'s Ex. 17. When Trabue purchased the Neighboring Properties, Trabue knew about the pesticide contamination. Pl.'s Ex. 16, Dep. of Trabue ("Tallichet Dep.") at 11:16–19..

In 2011, the OEPA investigated the contamination at the Site. Roth Report at 14. The OEPA determined that the maximum concentrations in the soil and ground water samples exceeded acceptable residential risk levels but did not exceed acceptable commercial risk levels. Roth Report at 14; *Id.* at Ex. 17–18. In her report, the OEPA's expert, Roth, concluded that direct contact with contaminated soil at the Site is unlikely because there is a commercial

building, as well as a driveway and parking areas covered with asphalt in good condition. Roth Report at 14.

In November of 2015, on behalf of a potential developer, a contractor collected soil samples from 20 soil-boring locations at the Neighboring Properties (*i.e.*, Lots 39, 40, 42, and 43). Roth Report at 14. The contractor also tested soil samples where Hull tested in 2008. *Id.* Upon reviewing the results of those samples, the contractor speculated that the contaminated soil at the Neighboring Properties would not exceed regulatory limits (which are outlined in 40 C.F.R. § 261.24). *Id.* at 14–15. Therefore, the contractor concluded, if excavated, the removed soil would not be considered hazardous waste. *Id.* at 15.

Based on these findings, in March 2016, the contractor collected supplemental soil samples from four more soil-borings. *Id.* The test results regarding those samples indicated concentrations of pesticides in the soil at the Neighboring Properties that exceeded acceptable residential risks. *Id.*

Over January and February 2017, Trabue hired Cox-Colvin & Associates, Inc. ("Cox") to perform additional soil testing at the Neighboring Properties. *Id.* Cox concluded that maximum pesticide concentrations exceeded acceptable residential limits. *Id.* Cox also found that if soil within Lot 42 was removed, it could be characteristically hazardous waste because two shallow soil samples indicated concentrations of heptachlor and heptachlor epoxide that exceeded regulatory limits. Roth Report at 15.

On May 30, 2018, Roth, an Environmental Specialist at the OEPA, filed the Roth Report, which analyzed facts, prior reports, and environmental data related to the Site and Neighboring Properties. *See* Roth Report. Based on that analysis, Roth concluded that the pesticide contamination at the Site and Neighboring Properties remains above the acceptable residential

risk goals, and that the contamination is not significantly degrading over time. *Id.* at 2. Roth also concluded that active remedial action to meet acceptable cleanup levels is needed to protect human health. *Id.* at 2. Roth found that persistent pesticide contamination exists in soil around the Site, based on her analysis of the OEPA's 2011 soil sampling. *Id* at 16. Further, Roth concludes that persistent pesticide contamination exists in soil around the Neighboring Property based on her review of the testing performed there between 2015 and 2017. *Id.*

**The Site: Maximum Concentration Findings**

| Date | Sample Location | Results | | Citations |
|---|---|---|---|---|
| 5/20/1981 | Soil | Chlordane | 5,920mg/kg | Roth Report at |
| | | Chlordane | 5,780mg/kg | Exhibit 2 |
| 7/28/1981 | Soil (from Gravel Area South of Garage) | Aldrin | 2,153mg/kg | Roth Report at |
| | | Chlordane | 84,064mg/kg | Exhibit 2 |
| | | Chlordane | 12,255mg/kg | |
| 1/2011 | Ground Water (Monitoring Well) | Dieldrin | 0.0131µg/L | Roth Report at Exhibits 17–18 |
| 1/2011 | Soil | Aldrin | 5.97mg/kg | Roth Report at |
| | | Chlordane | 75.1mg/kg | Exhibits 17–18 |
| | | Dieldrin | 15.0mg/kg | |
| 12/2017 | Indoor Air (Garage) | Dieldrin | 0.029 µg/m³ | Roth Report at Exhibits 23–24 |

**Neighboring Properties: Maximum Concentration Findings**

| Date | Sample Location | Results | | Source |
|------|-----------------|---------|---|--------|
| 1991 | Ground Water | Aldrin | 2.3µg/L | Roth Report at Exhibits 7–9 |
| | | Chlordane | 64µg/L | |
| | | Dieldrin | 1.6µg/L | |
| 1992 | Ground Water | Aldrin | ND | Roth Report at Exhibit 10 |
| | | Chlordane | 7µg/L | |
| | | Dieldrin | 0.6µg/L | |
| 1995 | Soil | Aldrin | 3.9mg/kg | Roth Report at Exhibit 10 |
| | | Chlordane | 1,200mg/kg | |
| | | Dieldrin | 27mg/kg | |
| 2008 | Soil | Aldrin | 3.01mg/kg | Roth Report at Exhibits 16 |
| | | Chlordane | 818mg/kg | |
| | | Dieldrin | 33.7mg/kg | |
| 2015 | Soil | Aldrin | 0.156mg/kg | Roth Report at Exhibits 19A–19D |
| | | Chlordane | 20.6mg/kg | |
| | | Dieldrin | 7.31mg/kg | |
| 2016 | Soil | Aldrin | 0.174mg/kg | Roth Report at Exhibits 19–21 |
| | | Chlordane | 10.4mg/kg | |
| | | Dieldrin | 4.47mg/kg | |
| 2017 | Soil | Aldrin | 85mg/kg | Roth Report at Exhibit 22 |
| | | Chlordane | 600mg/kg | |
| | | Dieldrin | 150mg/kg | |

## B. Procedural Background

On August 18, 2016, the State sued Defendants for various claims related to waste contamination. The State has moved for summary judgment against several Defendants, which, for clarity, the Court has organized into four groups.

First, against John G., John E., and Janice Breen (the "Breens"), the State alleges counts one (cost recovery under CERLCA), two (failure to comply with an order), three (operation of a hazardous waste facility without a permit), four (failure to have a closure plan), five (failure to remove hazardous waste in accordance with an approved closure plan), six (unpermitted discharges of industrial wastes and/or other wastes into waters of the state), seven (causing or contributing to soil contamination and/or water pollution), eight (statutory nuisance), nine (common law nuisance), and ten (ultrahazardous activity). The State moves the Court to enter summary judgment in its favor against the Breens on counts one, two, three, four, and five. The Breens filed a memorandum in opposition to the State's motion. The Breens also filed their own Motion for Summary Judgment regarding all ten counts.

Second, against Trabue, the State alleges counts one, three, four, five, eight, nine, and ten. With its Motion for Judgment on the Pleadings, Trabue proved grounds for dismissal of counts three, four, five, and ten. Now before the Court are crossmotions for summary judgment by the State and Trabue. The State moves the Court to enter summary judgment in its favor against Trabue on count one. Trabue, on the other hand, moves the Court to enter summary judgment in its favor on all remaining counts against it (*i.e.*, one, eight, and nine).

Third, in its Complaint the State alleges all ten counts against Buckeye, which has never made an appearance in this case. The State now moves for summary judgment against Buckeye on counts one, two, three, four, and five.

Fourth, against Dick, the State alleges counts one, three, four, five, eight, nine, and ten. The Court later dismissed counts three and ten. In its Motion for Summary Judgment, the State does not move against Dick. Currently pending before the Court is a Joint Motion to Enter Consent Decree between the State and Dick, which Trabue opposes. The Court does not address

15

that motion in this opinion. The motions for summary judgment filed by Trabue, the Breens, and the State are now ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party, who has the burden of proof at trial, fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

16

that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III. THE STATE'S MOTION

With its Motion for Partial Summary Judgment, the State moves the Court to find Defendants liable for the first five counts, as those apply to each Defendant. The State only moves for liability and does not address damages in its Motion. *See* Pl.'s Mot. for Partial Summ. J. at 14 ("The State does not request a ruling on the amount of the response costs or whether they are not inconsistent with the National Contingency Plan. Rather, it asks the Court to find liability for costs before moving to a trial on the merits of the amount of past costs and their consistency with the [National Contingency Plan], and its entitlement to future costs.").

The relevant statute is CERCLA, which "facilitates cleanup and remediation of contaminated lands, and shifts the financial burden of such environmental response actions to the parties responsible for releasing hazardous substances." *ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 456 (6th Cir. 2007). CERCLA imposes liability on certain categories of potentially responsible parties ("PRPs"), including: the current owner and operator of a contaminated facility, the owner or operator of a facility at the time hazardous substances were disposed of, and any person who arranged for disposal of such hazardous substances at a facility. 42 U.S.C. § 9607(a)(1)–(4). Upon identifying a contaminated site, the state or federal Environmental Protection Agency ("EPA") can clean the site itself, compel a PRP to clean the site, or enter into an agreement under which a PRP must clean the site. *Id.* §§ 9604, 9606, 9622. In this case, the OEPA and Buckeye agreed to the 1992 Director Orders, which bound "Buckeye, its officers and directors in their corporate capacity, agents, assigns, and successors in interest" to remedy the contamination at the Site and Neighboring Properties. *See* 1992 Director Orders.

## A. Count One—CERCLA Violation under Section 107

In its first count, the State asserts that all Defendants are liable for the State's response costs under CERCLA, section 107. To establish a prima facie case for response cost recovery, the State must establish four elements, including: (1) the property is a facility; (2) there has been a "release" or a "threatened release" of a hazardous substance; (3) the release has caused the plaintiff to incur necessary costs of response that are consistent with the National Contingency Plan ("NCP")[5]; and (4) the defendant is in one of four categories of potentially responsible parties ("PRPs"). *Regional Airport Authority v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006).

### 1. Element One: Facility

CERCLA squarely addresses the first element, defining "facility" as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located ...

42 U.S.C. § 9601(9). According to Congress: "[t]he definition of "facility" is necessarily a broad one. It explicitly defines facility as, among other things, any site or area where a hazardous substance has been deposited, stored, disposed of, or otherwise come to be located."

126 Cong. Rec. H 11773, H 11789 (Dec. 3, 1980), *reprinted in* 1 *Legis. Hist.* at 783 (remarks of Representative Florio).

"Courts have consistently interpreted the term 'facility' broadly." *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 708 (W.D. Ky 2003). Indeed, in *United States v. Township of Brighton*, the Sixth Circuit explained:

> The words of the statute suggest that the bounds of a facility should be defined at least in part by the bounds of the contamination. ... However, an area that cannot

---

[5] The NCP is a series of regulations promulgated by the EPA, which govern the clean up of hazardous waste sites. 42 U.S.C. § 9605(a).

be reasonably or naturally divided into multiple parts or functional units should be defined as a single "facility," even if it contains parts that are non-contaminated.

*U.S. v. Township of Brighton*, 153 F.3d 307, 313 (6th Cir. 1998).

Only Trabue and the State have discussed whether the Site and Neighboring Properties are collectively one facility or multiple facilities. In its Memorandum in Opposition to the State's Motion for Partial Summary Judgment, Trabue contends that "it makes no practical sense to artificially separate adjacent properties that have been contaminated by a single source." Trabue's Memo. in Opp. at 5. Likewise, in its reply brief, the State argues that "[t]reating the two properties as a single facility is consistent with CERCLA ...." Pl.'s Reply at 4. The Court agrees with both parties.

When "an area is managed as a whole, it is a single facility for CERCLA purposes." *Sierra Club*, 299 F. Supp. 2d at 709 (citing *Brighton*, 153 F.3d at 313 (6th Cir. 1998); *United States v. 150 Acres of Land*, 204 F.3d 698, 709 (6th Cir. 2000)) (additional citations omitted). This Court has held the same. In *Cytec Industries v. B.F. Goodrich Company*, this Court concluded that "usually, although perhaps not always, the definition of facility will be the entire site or area, including single or contiguous properties, where hazardous wastes have been deposited as part of the same operation or management." *Cytec Indus. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821 (S.D. Ohio 2002).

Here, the parties agree that Buckeye was the sole source of contamination at the Neighboring Properties and the Site. *See* 1992 Director Orders. Further, regarding their efforts to manage the monitoring and remediation of the contamination at the Site and Neighboring Properties, the OEPA, the Breens, Trabue, and Buckeye have always considered both properties to be one facility. For example, in an affidavit attached as an exhibit to the State's Motion for Default, Terri McCloskey ("McCloskey"), a Financial Program Manager in the Division of

19

Environmental Response and Revitalization at the OEPA, authenticated an exhaustive list of the response costs that the State has incurred in relation to the "Buckeye Terminix Site." *Id.* Those costs include investigating and monitoring the contamination at both the Site and the Neighboring Properties. *See* 1992 Director Orders (ECF No. 116-2, p. 101) ("Results of the sampling identified the presence of chlordane, aldrin and dieldrin in soils at the [Site] and on [the Neighboring Properties]."). Additionally, on May 29, 1995, John E. Breen, then-General Counsel and Director of Buckeye, sent the OEPA a remedial action plan for the Neighboring Properties, pursuant to his obligations under the 1992 Director Orders. Ex. 13, May 1995 Letter from John E. Breen. Therefore, the Court concludes that the Site and Neighboring Properties are collectively one facility.

## 2. Element Two: Release or Threatened Release of Hazardous Substances

The State must also establish that there has been a "release" or a "threatened release" of a hazardous substance at a facility. CERCLA defines "release" as:

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) ....

42 U.S.C. § 9601(22). CERCLA refers to other federal environmental statutes when classifying "hazardous substances." *See* 42 U.S.C. § 9601(14). There is no dispute that the contaminants found at the Site and Neighboring Properties are hazardous substances. 42 U.S.C. §§ 9601(14)(B), 9602(B); 33 U.S.C. § 1321(B)(4). Further, there is no dispute that hazardous substances were released at the Site, or that hazardous substances remain at the Site and Neighboring Properties.

Trabue contends that there is an issue, however, about whether a hazardous release ever occurred at the Neighboring Properties. Trabue does not dispute that Buckeye released

20

pesticides onto the Neighboring Properties or that hazardous contaminants remain there.[6] Instead, Trabue argues the State failed to establish there was ever a "release *from* the Neighboring Properties facility ...." Trabue's Memo. in Opp. of Pl.'s Mot. for Summ. J. at 5 (emphasis in original). CERCLA does not require such an enquiry.

Trabue argues that the State has failed to establish the second element (a release or threatened release at the facility). When addressing the second element, however, Trabue relies on language from section 9607(a)(4), which outlines the fourth element (PRPs that transport hazardous substances). Therefore, the Court finds no merit in Trabue's argument that the State must prove that there was a release *from* the Neighboring Properties. The proper enquiry is whether there was a release *at* the Neighboring Properties.

The parties agree there was "spilling, leaking, ... emitting, ... discharging, ... escaping, leaching, [or] dumping" of hazardous substances at both the Site and Neighboring Properties. Therefore, the State has established the second element.

## C. Element Three: Necessary Costs Consistent with the National Contingency Plan

The third element requires the State to establish that the release caused the State to incur "necessary costs of response" that are "consistent" with the NCP. *Reg'l Airport Auth. v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006). The Sixth Circuit has explained that "[a]s the language of the statute implies, whether the costs were 'necessary' is a threshold issue for recovery under section 107(a)." *Id.* But the State "does not request a ruling on the amount of the response costs or whether they are [consistent] with the [NCP]." Pl.'s Mot. for Summ. J. at 14, n.1. Rather, the

---

[6] Trabue asserts that the State cannot establish that the Neighboring Properties are a facility that released hazardous waste based solely on the presence of a 55-gallon drum, which has since been removed. The Court agrees. The drum cannot be considered a "release" or a "threatened release" because the drum was intact and was adequately removed from the Neighboring Properties in 2004.

State asks the Court to "find liability for costs before moving to a trial on the merits of the amount of past costs and their consistency with the NCP, and its entitlement to future costs." *Id.*

"[T]o establish a prima facie case of CERCLA liability, it is not necessary for Plaintiff to prove that the response costs were 'necessary' or 'consistent with the NCP.' Plaintiff need only show that it incurred costs in response to a threatened release of hazardous substances." *Regional Airport Authority*, 460 F.3d at 703. "Investigatory costs, … fall within the definition of response costs." *Containerport Group*, 128 F. Supp. 2d 470, 481 (S.D. Ohio 2001) (citations omitted).

Accordingly, at the summary judgment stage, the State must only establish that it incurred at least one recoverable cost in response to the release of hazardous substances. *Id.* Trabue argues that "the State has produced no evidence that it has incurred even a single response cost responding to a release of hazardous substances from the Neighboring Properties facility." Trabue Memo. in Opp. at 7. The Court disagrees. As the Court concluded, *supra,* a single facility encompasses the Neighboring Properties and the Site. The State has offered evidence of costs incurred responding to the hazardous releases at the facility. *See* PAGEID Nos. 615–20. Therefore, the State has established the third element.

**4. Element Four: Potentially Responsible Parties**

The four classes of persons strictly liable for releases of hazardous substances under CERCLA are: (1) current owners and operators of a facility where hazardous substances were disposed; (2) past owners or operators who owned or operated a facility at the time of release; (3) transporters of hazardous substances; and (4) persons who arranged for disposal or treatment at any facility containing such substance. *See* 42 U.S.C. § 9607(a). The State argues that all Defendants are covered persons under either section 9607(a)(1) or (2).

To establish liability under CERCLA's section 9607(a)(1), the State must prove that a defendant currently owns *and* operates a facility. *See* 42 U.S.C. § 9607(a)(1). In contrast, section 9607(a)(2) imposes liability on "any person who at the time of disposal of any hazardous substance *owned or operated* any facility at which such hazardous substances were disposed of[.]" 42 U.S.C. § 9607(a)(2) (emphasis added).

Under both sections 9607(a)(1) and (2), the threshold issue is whether a defendant is an "operator." CERCLA defines a facility's "operator" as "any person ... operating" the facility. 42 U.S.C. § 9601(20)(A)(ii). In *United States v. Bestfoods*, the Supreme Court sharpened the definition of "operator" to mean one who "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66–67.

In *United States v. Township of Brighton*, the Sixth Circuit highlighted that one must have some actual control over the polluting activities to be an "operator." *U.S. v. Township of Brighton*, 153 F.3d 307 (6th Cir. 1998) The Sixth Circuit chose to follow the "actual control" standard because the "meaning of the term 'operator' as expounded upon in *Bestfoods* does, after all, require that [the defendant] performed some affirmative acts ... before [the defendant] can be held responsible." *Brighton*, 153 F.3d at 314. In contrast, the Sixth Circuit explained that "[t]he failure to act, even when coupled with the ability or authority to do so, cannot make an entity into an operator." *Id*.

### a. The Breens

The State argues that the Breens are PRPs under section 9607(a)(2) because they owned or operated Buckeye when Buckeye employees dumped hazardous substances at the Site and the

Neighboring Properties. The Court will address the State's claims against the Breens separately based on their ownership of the Site and Buckeye.

### *i. John G. and Janice Breen*

The State asserts John G. and Janice Breen are liable for the costs of responding to and enforcing the cleanup of hazardous waste disposal at the Site and the Neighboring Properties because they owned and operated the Site and Buckeye from 1980 to about 2002. There is no dispute that John G. and Janice Breen jointly and exclusively owned the Site from 1980 to 2001. Further, there is no dispute that Buckeye disposed of hazardous substances at the Site and Neighboring Properties until 1987. *See* 1992 Director Orders at 2–3.[7] Thus, because John G. and Janice Breen were owners of a facility when a hazardous substance disposal occurred there, John G. and Janice Breen are PRPs under section 9607(a)(2).

John G. and Janice Breen argue they were never involved in Buckeye's pesticide operations. In his affidavit, John G. Breen avers Buckeye never dumped or disposed of pesticides in the manner the State depicted. The Court notes, however, the way the hazardous wastes were released is irrelevant. "Liability is strict; there is no requirement that the act resulting in a release of a hazardous waste be intentional, knowing, or even negligent." *Bob's Beverage*, 169 F. Supp. 2d at 723 (citation omitted). Likewise, in her affidavit, Janice Breen avers that she never: (i) had any substantive involvement with the company, (ii) visited the Site, (iii) met with employees, (iv) had any connection with any pesticides, or (v) participated in the operations at the Site. Janice Breen Affidavit at ¶ 2. Janice also avers that she "did not arrange,

---

[7] In the 1992 Director Orders, Buckeye agreed that "[u]ntil at least late 1987, Respondent used at the Facility numerous compounds for pest control, including, but not limited to, chlordane, aldrin, heptachlor, and dieldrin." Further, Buckeye—which was represented by John G. and John E. Breen—agreed that "[t]he discharge, deposit, injection, dumping, leaking, spilling, or placing of chlordane, aldrin and dieldrin into or onto the soil, groundwater, and surface water at or from the Facility constitutes 'disposal' of hazardous waste as defined in ORC 3734.01(F) and used in ORC 3734.20."

purchase, store, manage or handle pesticides. And [she did] not even know what pesticides were present on the property." Janice Breen Affidavit at ¶ 3.

To be clear, John G. and Janice Breen are PRPs because they owned the Site—a facility for CERCLA purposes—when Buckeye dumped hazardous waste there. Those hazardous substances also reached the Neighboring Properties. Therefore, the Court need not address whether John G. and Janice Breen's ownership and involvement in Buckeye also establishes they are PRPs under section 9607(a)(2).

Accordingly, regarding count one, the Court **GRANTS** the State summary judgment against John G. Breen and Janice Breen.

### ii. John E. Breen

The State argues that John E. Breen is personally liable for the State's response costs under section 9607(a)(2) since he was responsible for Buckeye's environmental compliance at the Site and the Neighboring Properties from 1991 to 2007. In other words, the State contends that John E. Breen operated Buckeye when it disposed of hazardous substances. Specifically, the State contends that John E. Breen:

> had the authority to ensure compliance—he hired contractors, directed sampling, communicated with Ohio EPA, paid invoices to Ohio EPA, and sought reimbursement from insurance companies. He knew what was required for compliance; and he knew that the remedy was not complete.

Pl.'s Reply Brief at 2 (citations omitted).

In response, John E. Breen concedes he began working for Buckeye around 1991. But because the State agrees that no disposal occurred after 1987, he contends, all his compliance actions on behalf of Buckeye are irrelevant. The Court agrees.

There is no dispute that from about 1991 to 2004, John E. Breen hired environmental consultants, directed sampling analysis, and oversaw the removal of a 55-gallon drum. But

25

although John E. Breen actively directed operations related to remedying the pollution at the facility, the State has not offered evidence that he conducted operations at the time of any hazardous disposal. For example, the State asserts that John E. Breen operated Buckeye Terminix from 1992 to 2004, yet also admits that there is no proof of a hazardous release at the facility after 1987. *See* Pl.'s Mot. S.J. at 16. On the other hand, John E. Breen avers that he was in school until 1982 and then practiced law until 1992. Affidavit of John E. Breen at ¶ 5.

Therefore, because John E. Breen never conducted operations having to do with decisions about compliance with environmental regulations at the time of any hazardous disposal, he is not a PRP under section 9607(a)(2) of CERCLA. Thus, regarding count one, the Court **GRANTS** John E. Breen summary judgment.

### b. Buckeye

In 2002, John G. and John E. Breen ceased operating Buckeye and sold its assets. In 2007, the State of Ohio cancelled Buckeye's standing. Buckeye has not entered an appearance in this case. On that basis, the State previously moved the Court to enter default judgment against BTX Enterprises. (ECF No. 114). The Court denied that motion. (ECF No. 130).

Now the State moves for summary judgment against Buckeye, arguing that Buckeye is liable for response costs since it operated at the Site from 1980 until 2002. There is no dispute that during that time Buckeye operated its business, stored its trucks and chemicals, used and handled the hazardous materials still present in the environment, and installed then later removed the underground storage tank for pesticide-contaminated water. Additionally, the State asserts that Buckeye is liable because the company signed the 1992 Director Orders, thereby accepting responsibility and promising to remedy the contamination at the facility.

26

Although Buckeye released hazardous substances at the facility, the Court cannot hold Buckeye liable. Sister courts around the Sixth Circuit have consistently refused to hold defunct corporations liable for response costs under CERCLA. In *United States v. Distler*, the court determined a corporation that had dissolved nine years earlier and a shareholder to whom corporate assets had been distributed could not be held liable under CERCLA for federal government's response costs in cleaning up hazardous waste that corporation had previously released. *U.S. v. Distler*, 741 F. Supp. 643 (W.D. Ky. 1990). The court granted the defendant's motion to dismiss because the government offered "no convincing authority to support its position that a corporation which has completely wound down and distributed its assets can be held liable under CERCLA." *Id.* at 647.

Similarly, in *Traverse Bay Area Intermediate School Dist. v. Hitco, Incorporated*, the court held that while "an existing corporation is clearly a 'person' under CERCLA, a non-existent corporation cannot be included within that definition." 762 F. Supp. 1298, 1301–02 (W.D. Mich. 1991). The court concluded that when a corporation has no standing to sue or defend a lawsuit, and any possible judgment against the defunct corporation would uncollectible, CERCLA does not impose liability. *Id.*

Accordingly, Buckeye is not liable for the State's response costs because it has no standing to prosecute or defend lawsuits and has no assets: the State of Ohio cancelled Buckeye's standing nine years before the State initiated this lawsuit; and Buckeye liquidated its assets roughly fourteen years before the State filed this suit. For those reasons, CERCLA does not apply to Buckeye. Therefore, the Court **DENIES** the State summary judgment against Buckeye on count one.

27

## c. Trabue

As discussed, *supra*, there is no dispute that the Neighboring Properties and the Site qualify as a collective "facility" under CERCLA. There is also no dispute that Buckeye caused all the contamination at the Neighboring Properties and the Site. The State claims that Trabue, as the current owner of the Neighboring Properties, is strictly liable as a PRP because Buckeye dumped chlordane that migrated to three of Trabue's parcels, where it remains. But the State never argues whether the elements of a prima facie CERCLA violation apply to Trabue. Instead the State concludes that "through strict liability, Trabue Dublin is jointly and severally liable for the State's response costs under CERCLA." Pl.'s Mot. for Summ. J. at 17.

In response, Trabue refutes that it is a PRP under any section of CERCLA. To support this argument, Trabue relies on *Alprof Realty LLC v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, No. 09-CV-5190, 2012 4049800, at *5 (E.D.N.Y. Sept. 13, 2012). In *Alprof*, the court explained that "[i]f a person merely controlled a site on which hazardous chemicals have spread without that person's fault, that person is not a polluter and is not one upon whom CERCLA aims to impose liability." *Alprof Realty LLC v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 2012 WL 4049800, at *6 (E.D.N.Y. Sept. 13, 2012) (quoting *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 178 (2d Cir. 2003); *see ABB Industrial Systems, Inc. v. Prime Technology, Inc.*, 120 F.3d 351 (2d Cir. 1997)). The Court finds Trabue's argument persuasive.

First, Trabue has established it is not a PRP under section 9607(a)(1) because Trabue does not own *and* operate a hazardous waste facility. To be held liable under section 9607(a)(1) requires current ownership and active participation in the hazardous release. *Brighton*, 153 F.3d at 314 (an operator is one who must have "performed some affirmative acts ... before they can

be held responsible"). The State concedes Trabue never conducted any operations related to the disposal of hazardous substances at the facility. The State also agrees that Buckeye was the sole cause of the contamination at the Site and the Neighboring Properties. Therefore, Trabue is not a PRP under section 9607(a)(1).

Second, Trabue has also established that it is not a PRP under section 9607(a)(2), which imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). Trabue purchased the Neighboring Properties from its parent company, Specialty, in 2010. The State has never contended that anyone disposed of hazardous wastes at the Site or Neighboring Properties since 1987. Thus, section 9607(a)(2) does not apply to Trabue. Accordingly, Trabue is not a PRP. Therefore, regarding count one, the Court **GRANTS** Trabue summary judgment.[8]

### 5. Conclusion

In conclusion, on count one the Court hereby **GRANTS** summary judgment to the State against John G. and Janice Breen, **DENIES** the State summary judgment against Buckeye, and **GRANTS** summary judgment to John E. Breen and Trabue.

### B. Count Two—Failure to Comply with Work and Cost Reimbursement Order

In its second count, the State alleges that John E. Breen, John G. Breen, and Buckeye failed to comply with the 1992 Director Orders, thereby violating Ohio Revised Code sections 3734.11(A) and 3734.13. Section 3734.13(C) lists numerous civil penalties a court may impose on a person who violates "a term or condition of a[n] … order." Ohio Rev. Code § 3734.13(C).

---

[8] In its Motion for Summary Judgment, Trabue raises three affirmative defenses to Count One: divisibility, third-party defense, and statute of limitations. The Court need not address these defenses because Trabue is not liable for that count.

The issue is whether the State has established there is no dispute of material fact that the Breens and Buckeye violated the 1992 Director Orders.

The 1992 Director Orders required Buckeye and "its officers and directors in their corporate capacity, agents, assigns, and successors in interest" to remediate the contamination at the Site and Neighboring Properties. The 1992 Director Orders required the bound parties to complete "investigatory field work, reporting requirements and implementation of any remedial action found necessary …." Finally, the 1992 Director Orders "shall be satisfied when [Buckeye] demonstrates in writing and certifies to Ohio EPA's satisfaction that all activities required under these Orders (including any additional tasks which OEPA determined to be necessary in accordance with the provisions of these Orders and payment of oversight costs) have been completed and Ohio EPA approves such certification in writing." 1992 Director Orders at 12.

The State concedes that the Breens initially complied with the 1992 Director Orders by capping the contamination with soil, establishing vegetation, and performing some sampling. Pl.'s Mot. for S.J. at 18. The State argues, however, that the Breens did not perform all required follow up actions to ensure that the remedies were effective. *Id.* Further, the State argues the 1992 Director Orders still apply to Buckeye and the Breens because they never requested the OEPA to terminate the 1992 Director Orders. For that reason, the State contends, Buckeye and the Breens are still bound by the Orders.

As a preliminary matter, the Court must determine whether Buckeye, John G. Breen, and John E. Breen are bound by the 1992 Director Orders. The Court looks to Ohio Revised Code section 1701.88 for guidance, since count two is a state law claim. Section 1701.88 establishes the powers of an Ohio corporation after dissolution and provides:

30

> (B) The ... cancellation of the articles of a corporation ... shall not eliminate or impair any remedy available to or against the corporation or its directors, officers, or shareholders for any right or claim existing, or liability incurred, prior to the dissolution, if ... [a]ny person before five years after the date of the dissolution or within the time limits otherwise required by ... any other provision of law, whichever is less.

O. R. C. §§ 1701.88(B). Accordingly, section 1701.88(B) limits the period a dissolved Ohio corporation can be liable for any existing claim or right against it to five years after the corporation's dissolution.

Here, the Ohio Secretary of State cancelled Buckeye's articles of incorporation on February 6, 2007. Breen Dep. at 30:12–17; Breen Dep., Ex 7. Therefore, remedies available against Buckeye and its directors, officers, and shareholders for any right existing prior to its dissolution were no longer cognizable against Buckeye after February 6, 2012. To be clear, this statute only limits Buckeye's capacity to sue or be sued based on its corporate status. Accordingly, the Court must address whether individuals can be held personally liable for violating an environmental enforcement action.

The State relies on *Ohio ex rel. DeWine v. Muncy*, where this Court refused to dismiss the State of Ohio's claim alleging the defendant, the previous President and owner of a defunct company, failed to comply with an Ohio EPA Director Final Findings and Order agreement, No. 3:15-cv-376, 2017 WL 1177617, at *5 (S.D. Ohio March 30, 2017). In *Muncy*, the Court concluded that the defendant was bound by the requirements of the Order because, as President and owner of the company that entered the agreement, he knew his duties to act, ignored the Ohio EPA's warnings, and had the requisite authority to implement the requirements of the Order. The Court finds *Muncy* persuasive.

John E. and John G. Breen negotiated and agreed to the 1992 Director Orders. Therefore, they knew what the Orders required. In fact, after selling and winding up Buckeye in 2002, John

E. Breen continued communicating with the OEPA about follow-up testing and remediation. Moreover, around 2004, John E. Breen hired consultants to test soil samples from the facility and sent those results to the OEPA. But when the OEPA immediately notified the Breens that the analysis method was insufficient, the Breens ignored the OEPA's requests and notices that additional tests were required. In 2008, the OEPA again notified the Breens that additional sampling was necessary and that the original remedies had failed. Again, the Breens refused to act or respond. Strayton Aff. at ¶¶ 9–11; Breen Dep. 54:17–22. Therefore,

Additionally, the State points out that courts around Ohio have imposed liability and civil penalties on individuals who violated an environmental statute, even when the person was also an officer or employee of a corporate defendant. Pl.'s Mot. for S.J. at 18 (citing *State ex rel. DeWine v. Deer Lake Mobile Park*, 11th Dist. No. 2013-G-3156, 2015-Ohio-1060, 29 N.E.3d 35 ¶ 57; *State ex rel. DeWine v. Sugar*, 7th Dist. Nos. 14 JE 0004, 14 JE 0006, 2016-Ohio-884. 60 N. E. 3d 735 ¶ 41). Although the cases that the State cites are based on violations of Ohio's clean water and asbestos regulations, the Court finds them persuasive because they ultimately addressed the issue of "personal liability based on the personal participation theory in an environmental enforcement action." *State ex rel. DeWine v. Sugar*, 60 N. E. 3d at 742 (citing *Deer Lake Mobile Park*, 29 N. E. 3d 35). Plus, this Court applied *Deer Lake Mobile Park* in *Muncy*, which involved hazardous substances spilling and migrating to nearby groundwater.

Under the personal participation theory, Ohio courts consider whether—pursuant to an environmental enforcement action—the individual made decisions, gave orders, oversaw operations, served as the primary contact with administrative parties, and "importantly, ... failed to correct known violations even though [the individual] had the requisite authority to do so." *Id.*

Under those considerations, the Court concludes that John E. and John G. Breen are both personally liable for violating the 1992 Director Orders.

John E. and John G. Breen both served as officers and directors of Buckeye from at least 1992 to around 2002. John E. Breen oversaw sampling and remedial measures, which included capping the contamination with soil, establishing vegetation, and serving as Buckeye's primary contact with the OEPA. In the same manner, John G. Breen signed the 1992 Director Orders as the President of Buckeye and oversaw the operations and finances of Buckeye until he and John E. Breen organized its asset sale in 2002. Further, John G. and John E. Breen split the proceeds of that sale between themselves. Therefore, the Breens actively participated in negotiating, executing, and then following the 1992 Director Orders. Further, they had the authority and finances to comply with the 1992 Director Orders, but instead chose to ignore the OEPA. Conversely, no such evidence has been presented against Janice Breen. For those reasons, regarding count two the Court **GRANTS** the State summary judgment against John E. and John G. Breen, **DENIES** the State summary judgment against Buckeye, and **GRANTS** summary judgment to Janice Breen.

## C. Counts Three, Four, and Five

The State argues Buckeye and the Breens violated Ohio law by operating a hazardous waste facility without a permit, closure plan, or closure action. *See* Ohio Rev. Code §§ 3734.02(E) and (F); *see also* Ohio Adm. Code 3745-55-12. As a result, the State contends, the Breens and Buckeye are subject to injunctive relief.

The threshold issue for count three, four, and five against Buckeye and the Breens is whether the State has proved that those defendants currently own a hazardous waste facility.[9] Under Ohio law, a "facility" or "hazardous waste facility" means:

> [a]ll contiguous land, structures, other appurtenances, and improvements on the land, used for treating, storing, or disposing of hazardous waste. A facility may consist of several treatment, storage, or disposal operational units (e.g., one or more landfills, surface impoundments, or combinations of these).

> For the purpose of implementing corrective action under rule 3745-54-101 of the Administrative Code, all contiguous property under the control of the owner or operator seeking a permit under the hazardous waste rules. This definition also applies to facilities implementing corrective action under Section 3008(h) of RCRA or section 3734.20 of the Revised Code.

O.R.C. 3745-50-10(A)(48)(a) & (b). Section 3734.02(E)(2) further defines on-site facility as "a facility that stores, treats, or disposes of hazardous waste that is generated on the premises of the facility" and off-site facility as "a facility that stores, treats, or disposes of hazardous waste that is generated off the premises of the facility and includes such a facility that is also an on-site facility." O.R.C. § 3734.02(E)(1)(a) & (b). "Storage" is defined as "the holding of hazardous waste for a temporary period, at the end of which the hazardous waste is treated, disposed of, or stored elsewhere." Ohio Admin. Code § 3745-50-10-122. "Treat" or "treatment" are defined as "any method, technique, or process designed to change the physical, chemical, or biological characteristics or composition of any hazardous waste; to neutralize the waste; to recover energy or material resources from the waste …." Ohio Admin. Code § 3745-50-10(137).

---

[9] *See State of Ohio ex rel. DeWine v. Breen*, No. 2:16-cv-802, 2018 WL 4096369, at *3–5 (S.D. Ohio Aug. 28, 2018) (finding counts three, four, and five require current ownership; also noting "[u]nlike count three, the statutory text under which the State brings counts four and five requires the defendant to own a hazardous waste facility, but does not require current operation of said facility").

Finally, "disposal" includes "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any hazardous waste into or on any land or water or air." Ohio Admin. Code 3745-50-10(A)(36).

As this Court discussed in an earlier opinion regarding Trabue and Dick's motions for judgment on the pleadings, "the verbs within the statutory definition of 'hazardous waste facility' implicitly necessitate activity related to the existence of hazardous waste on the property." *State of Ohio ex rel. DeWine v. Breen*, No. 2:16-cv-802, 2018 WL 4096369, at *4 (S.D. Ohio Aug. 28, 2018); *see State ex rel. Ohio AG v. LG Dev. Corp.*, 2010-Ohio-1676, 187 Ohio App.3d 211, 219 (6th Dist. Ohio 2010). The State argues that "a listed hazardous waste[] was deposited, placed, injected, dumped and/or spilled in the soil and groundwater at both the [Site] and the Neighboring Properties." Pl.'s Mot. for Summ. J. at 20.

The Breens argue they have no affiliation with the relevant sites and they do not "store, treat, or dispose of hazardous waste." Moreover, the Breens argue that they have no legal obligation to "orchestrate any closure plan over a property they do not own, operate, manage, or even have position to remediate." Def. Breens' Mot. for S.J. at 15. As a result, the Breens contend, they are all entitled to summary judgment on these claims.

The Breens argument has merit. The statutory text under which the State brings counts three, four, and five requires the defendant to currently own the facility. *See State of Ohio ex rel. DeWine v. Breen*, No. 2:16-cv-802, 2018 WL 4096369, at *4 (S.D. Ohio Aug. 28, 2018) ("[o]peration of a hazardous facility implicitly requires the ongoing use of that property as a hazardous waste facility as opposed to the land being a hazardous waste facility."). Here, the Breens do not own the Site or Neighboring Properties. The Breens sold the Site to Dick in 2008. Further, the State of Ohio cancelled Buckeye's articles of incorporation in 2007. Accordingly,

on counts three, four, and five, the Court **GRANTS** the Breens summary judgment and **DENIES** the State summary judgment against Buckeye.

## IV. BREENS' MOTION

### A. Counts Six, Seven, Eight, Nine, and Ten

The Breens did not specifically move for summary judgment on counts six, seven, eight, nine, or ten. Instead, the Breens' Motion for Summary Judgment broadly asserts that counts six through ten are "repetitious of the [other claims], and their shortcomings are evident for the same reasons stated above." Breen Resp. to Pl.'s Mot. for S.J. at 15. Without more, the Breens fail to meet their initial burden of establishing that there are no genuine issues of material fact for each of those counts. *See* Fed. R. Civ. P. 56(a). Accordingly, the Court **DENIES** summary judgment to the Breens on counts six, seven, eight, nine, and ten.

### B. Donald Dick's Crossclaims Against the Breens

Dick, the current owner of the Site, filed a crossclaim against the Breens, alleging four counts. Those counts include contribution for costs under federal and Ohio law, equitable indemnity, and declaratory judgment. The Breens move for summary judgment on Dick's crossclaims.

The Breens assert that the Court must grant them summary judgment on Dick's crossclaims because the Breens sold Dick the contaminated property "as is," and because Dick agreed to indemnify the Breens if the EPA subsequently brought action against them. The Breens further assert that they do not have a copy of this agreement, due to the passage of time. Nonetheless, based on their "information and belief, EPA affirmatively led Dick to believe that the decades of cooperative, reasoned approaches to any issue would be carried forward." Def. Breens' Mot. for S.J. at 19.

The Breens' argument is not well taken. This Court has previously rejected their "as is" argument, concluding that "the fact that former site owner gave present owner quitclaim deed and sold property 'as is' did not negate former owner's strict liability under CERCLA." *Containerport Group, Inc. v. American Financial Group, Inc.*, 128 F. Supp. 2d 470, n.6 (S.D. Ohio 2001) (citing *M & M Realty Co. v. Eberton Terminal Corp.*, 997 F. Supp. 683, 688 (M.D. Pa. 1997)). Additionally, the Court cannot rely on the Breens' claim that Dick agreed to indemnify the Breens for any prospective actions by OEPA since there is no evidence of this agreement on the record. Accordingly, the Court **DENIES** summary judgment to the Breens on Dick's crossclaim.

## V. TRABUE'S MOTION

### A. Summary Judgment on Counts Eight and Nine[10]

Count eight of the State's Complaint alleges Trabue is liable for statutory nuisance under Ohio Revised Code section 3767.13(B), which provides that "[n]o person shall cause or allow offal, filth, or noisome substances to be collected or remain in any place to the damage or prejudice of others or of the public." Count nine of the State's Complaint alleges that Trabue is also liable for common law nuisance. Under Ohio common law, "nuisance" is a term used to designate the wrongful invasion of a legal right or interest. *Banford v. Aldrich Chem. Co.*, 126 Ohio St.3d 210, 213, 932 N. E. 2d 313, 317 (2010) (citing *Taylor v. Cincinnati*, 143 Ohio St. 426, 55 N. E. 2d 724, 729 (1944)).

Under Ohio law, in both common law and statutory nuisance claims, the plaintiff must establish that the defendant's actions wrongfully invade a legal right or interest. In its Complaint, the State claims that the contamination at or near the Site and Neighboring Properties

---

[10] Trabue also moved for summary judgment on count one, however, the Court already addressed Trabue's arguments on that count in section III.

"has or is threatening to damage members of the public including neighboring property residents who may come into contact with the contaminated soil and ground water." Pl.'s Compl. at ¶¶ 130–31. In other words, the State claims that Trabue is liable for common law and statutory nuisance because hazardous substances at the Neighboring Properties threaten trespassers.

In its Motion for Summary Judgment, Trabue first argues that the statute does not apply because it was never intended to regulate the disposal of solid and hazardous wastes, which are comprehensively regulated under section 3734. Moreover, Trabue contends that, even if the statute did apply, the State's claim must fail because undisputed facts demonstrate that there is no current threat to the public or neighboring property owners, and that the State's witnesses have conceded the absence of any threat to the public. In that regard, Trabue argues that the pesticides at the Neighboring Properties only potentially threaten a trespasser and that a landowner owes no duty to a trespasser, except to refrain from willful, wanton, or reckless conduct that will likely injure the trespasser. The Court agrees.

Here, the parties agree the Neighboring Properties still have hazardous substances exceeding levels appropriate for residential use. Yet the lots composing Neighboring Properties are not used for residential purposes—they remain undeveloped. Moreover, the State and Trabue's experts have concluded that the remaining pesticides at the Neighboring Properties do not pose a threat to nearby residents. Therefore, the only members of the public potentially threatened by exposure to those hazardous substances are hypothetical trespassers. This is fatal to the State's claim because trespassing is not a public right.[11] Accordingly, the Court **GRANTS** Trabue summary judgment on counts eight and nine.

---

[11] *C.f. City of Cincinnati v. Deutsche Bank National Trust Co.*, 863 F.3d 474, 477 (6th Cir. 2017) (explaining that public rights include: "right of public passage (*e.g.*, obstruction of highways); a right to use public space (*e.g.*, pollution of fisheries); a right to navigable waterways (*e.g.*, obstruction of public streams); a right to public health (*e.g.*, exposure to diseased animals); a right to public safety (*e.g.*, negligent marketing/sale of dangerous weapons); a

# VI. CONCLUSION

In conclusion, the Court **GRANTS in PART** and **DENIES in PART** the State's Motion for Partial Summary Judgment (ECF No. 116). On count one, the Court **GRANTS** the State summary judgment against Defendants John G. Breen and Janice Breen and **DENIES** the State summary judgment against Defendants John E. Breen, Trabue, and Buckeye. On count two, the Court **GRANTS** the State summary judgment against John G. Breen and John E. Breen and **DENIES** summary judgment against Janice Breen and Buckeye. On counts three, four, and five, the Court **DENIES** the State summary judgment against Buckeye, John G. Breen, John E. Breen, and Janice Breen.

Accordingly, the Court **GRANTS** Trabue's Motion for Summary Judgment (ECF No. 118) on counts one, eight, and nine.

Finally, the Court **GRANTS in PART** and **DENIES in PART** the Breens' Motion for Summary Judgment (ECF No. 117). On count one, the Court **GRANTS** summary judgment to John E. Breen and **DENIES** summary judgment to John G. Breen and Janice Breen. On count two, the Court **DENIES** summary judgment to John G. Breen and John E. Breen and **GRANTS** summary judgment to Janice Breen. On counts three, four, and five, the Court **GRANTS** summary judgment to John G. Breen, John E. Breen, and Janice Breen. On counts five, six, seven, eight, nine, and ten, the Court **DENIES** summary judgment to John G. Breen, John E. Breen, and Janice Breen. Regarding Dick's crossclaim, the Court **DENIES** summary judgment to John G. Breen, John E. Breen, and Janice Breen.

---

right to public morality (*e.g.*, houses of ill-repute); a right to public peace (*e.g.*, excessive noise); and a right to public comfort (*e.g.*, excessive odors or fumes). Restatement (Second) of Torts § 821B & cmt. a; *see City of Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 768 N.E.2d 1136, 1142 (2002).")

**IT IS SO ORDERED.**

1-18-2019
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**

40