# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**STATE OF OHIO,**

      **Plaintiff,**

                           **Case No. 2:16-cv-802**

   **v.**                         **JUDGE EDMUND A. SARGUS, JR.**

                                **Magistrate Judge Kimberly A. Jolson**

**JOHN G. BREEN,** *et al.*,

      **Defendants.**

## OPINION AND ORDER

This matter arises on claims brought by the State of Ohio (the "State") against, *inter alia*, Defendants John G. Breen, John E. Breen, and Janice Breen (the "Breen Defendants") regarding hazardous chemicals that were dumped at and around 2121 Riverside Drive, Upper Arlington, Ohio (the "Site") from 1980 to 1987. At summary judgment, the Court partially resolved two of those claims—specifically, Counts One and Two—in the State's favor. (Op. & Order, ECF No. 143.) In so doing, the Court cabined its judgment to the issue of liability. It did not determine what relief the State is owed.

In March of 2019, this Court held a one-day bench trial to resolve that question. Soon thereafter—and before issuing its opinion—the Court stayed all proceedings to facilitate settlement discussions between the State and various other defendants. That stay has since been lifted.

Accordingly, for the reasons stated herein, the Court **FINDS** as follows:

1. Under Count One, and pursuant to § 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the State is entitled to reimbursement of its "response costs" from John G. and Janice Breen. Thus far, the amount of these costs totals at least $379,531.09.

2. Under Count Two, and pursuant to Ohio Revised Code § 3743.10, the State is entitled to injunctive relief from John G. and John E. Breen. The Court is persuaded that the specific relief the State seeks—removal of certain contaminated portions of various lots neighboring the Site—is warranted.

1

**I.**[1]

A. **Factual Background**

      The underlying history of this case, which spans over thirty years, is somewhat complex.

Of relevance are the following undisputed facts:

> In 1980, the owner and President of Buckeye Terminix Company, Inc. ("Buckeye"), John G. Breen, and his wife, Janice Breen, purchased [the Site] in their own names. Buckeye was located at the Site from at least 1980 to 2002. Buckeye provided extermination services around Ohio from 1957 to 2002.

> The Site housed Buckeye's building, which had an office space and a connected garage. That building has always been surrounded by parking areas and driveways. Immediately west of the Site, down a steep embankment, is a tract of five land plots addressed to Scioto Pointe Lane (the "Neighboring Properties").

> From 1980 until at least 1987, Buckeye maintained pesticides at the Site for its extermination business. Buckeye employees used the garage space and outdoor areas to mix, transfer, and store chlordane, aldrin, heptachlor, and dieldrin. Buckeye employees also loaded, unloaded, and washed trucks containing pesticides at the facility, and they dumped pesticide-laden water at the Site and onto the western embankment.

> From 1980 to 2002, John G. Breen served as President/General Manager of Buckeye and as the President of its Board of Directors. He also managed Buckeye's finances. Janice was Safety Director and served as Secretary of the Board of Directors. Starting around 1980, John G. and Janice Breen were the majority owners of Buckeye. In 1987, John E. Breen, son of John G. and Janice Breen, also gained ownership in Buckeye. In 1992, John E. Breen became Buckeye's General Counsel and Vice President.

> . . .

> In 1981, Buckeye employees complained to the Ohio Environmental Protection Agency (the "OEPA") about pesticide-dumping at the Site. In response, the OEPA's Office of Emergency Response staff collected two soil samples from the Site. Those samples showed concentrations of chlordane between 5,780 and 5,920 parts per million ("ppm").

> In a letter dated July 10, 1981, the OEPA notified Buckeye that its hazardous disposal was illegal and violated Ohio law. In the letter, the OEPA requested that Buckeye implement measures to prevent further releases of pesticides into the environment. Because of the OEPA's letter, Buckeye installed a drainage collection

---

[1] For a full factual background, the Court directs readers to its January 2019 Opinion and Order granting in part and denying in part summary judgment. (ECF No. 143.)

system, paved its parking lot with asphalt, maintained the vegetated area at the embankment, and allowed the OEPA to monitor the Site.

The OEPA continued sampling soil, gravel, and water runoff at Site in 1981, 1982, and 1989. Each time, the OEPA found aldrin, chlordane, and dieldrin, among other pesticides.

(Op & Order, ECF No. 143 at PageID #3240-41) (citations omitted).

### 1. Ownership of the Neighboring Properties

In December 1985, Specialty Restaurant Corporation ("Specialty"), Defendant Trabue Dublin LLC's ("Trabue") parent company, purchased the Neighboring Properties. (*Id.* at PageID #3241.) Years later, in January 1995, Specialty sold all but the properties' contaminated lots—*i.e.*, lots 39, 40, 42, and 43—to a residential developer. (*Id.* at PageID #3245.) The non-contaminated lots were thereafter developed into a private residential subdivision (the "Scioto Pointe Properties"), while the contaminated lots remained vacant. (*Id.*)

**Figure 1: The Contaminated Lots[2]**



---

**Figure 2: Approximate Location of the Neighboring Properties' Contamination[3]**



In 2010, Specialty formed Trabue as a subsidiary, then sold the Neighboring Properties to Trabue for a nominal price. (*Id.* at PageID #3241.)

### 2. The 1992 Director's Orders

On June 26, 1992, OEPA Director Donald Schregardus issued a Director's Final Findings and Orders ("1992 Director's Orders" or "Orders"). (Ex. 5, ECF No. 116-2.) The 1992 Director's Orders applied to and bound "Buckeye Terminix, Inc. ('Respondent'), its officers and directors in their corporate capacity, agents, assigns, and successors in interest," and required Buckeye, among other things, to: (1) implement an "interim" action plan to "characterize the extent of pesticide and volatile organic compounds" in the Neighboring Properties' soil; and (2) take "appropriate remedial measures . . . as approved by the OEPA." (*Id.* at PageID #807-12, 822.) It also required Buckeye to repay the OEPA's "oversight and response costs . . . [w]ithin thirty (30) days of the receipt of the first accounting of these costs incurred up to the effective date of the Order." (*Id.* at PageID #814.) Notwithstanding this provision, the OEPA "reserve[d] the right, if any, to take any

---

[3] (ECF No. 116-2 at PageID #875) (titled "Unrestricted Residential Soil Removal").

enforcement action, recover costs, or seek damages for injury to natural resources pursuant to any available legal authority for past, present, or future violations of ORC Chapters 3734 or 6111, conditions at the Site or Facility, or releases of hazardous wastes or substances." (*Id.* at PageID #816.)

As set forth in Section XII, the Orders would terminate once Buckeye

demonstrates in writing and certifies to the Ohio EPA's satisfaction that all activities required under these Orders (including any additional tasks which OEPA determined to be necessary in accordance with the provisions of these Orders and payment of oversight costs) have been completed and Ohio EPA approves such certification in writing.

(*Id.* at PageID #818.)

### 3. The Interim Remedy

In March 1993, the OEPA approved an "interim" remedy for the Neighboring Properties (the "Interim Remedy"). Specifically, it "recommended revegetation at the contaminated area, unless affected lots were to be developed, in which case installation of a soil cover was recommended to eliminate potential exposure to the hazardous substances." (Op. & Order, ECF No. 143 at PageID #3244.)

In June 1996, the OEPA informed Buckeye via letter that H.R. Ransom, a developer, intended to residentially develop Lot 42 (the "1996 Letter"). (ECF No. 118-17.) The letter, among other things, also updated Buckeye on the status of the 1992 Director's Orders, and acknowledged that Buckeye had begun to implement the Interim Remedy. (*Id.*) It further affirmed that

[f]inal termination of the order . . . will occur once Buckeye Terminix has shown that all tasks of the statement of work and payment of Ohio EPA oversight costs have been completed and certified in writing. Completion of the remedy will occur once contamination meets acceptable risk levels and [Lot 42] is released for development.

*Id.* In response to the 1996 Letter, John E. Breen asked the OEPA to delay soil sampling on Lot 42 by two years to afford the pesticides dumped thereon more time to naturally degrade. (ECF No. 116-2 at PageID #752.)

### 4. 2002-2003: Buckeye Terminix Ceases Operations; Soil Testing Continues

In 2002, John G. and John E. Breen shuttered Buckeye and sold its assets to its franchisor, Terminix International, for roughly $3-4 million. (Op. & Order, ECF No. 143 at PageID #3247.) Despite this, John E. Breen continued to work with the OEPA as Buckeye's representative. Accordingly,

> [o]n February 7, 2002, the OEPA sent a letter to John E. Breen and Buckeye, requesting a workplan for sampling soils from Lot 42. The letter notified Buckeye that the workplan was due in 60 days. Further, the letter explained that, upon the OEPA's approval of a proposed workplan, Buckeye needed to implement the approved workplan so that the OEPA could test the soil and then compare the results to cleanup goals. John E. Breen responded with a letter dated April 29, 2002, which explained that Buckeye no longer operated. The letter also notified the OEPA that John E. Breen would still initiate a final soil sampling event.

(*Id.* at PageID #3247) (citations omitted).

Several months later, on June 29, 2002, John E. Breen sent the OEPA a letter which proposed various protocols for testing and analyzing the soil on Lot 42. (ECF No. 119-1 at PageID #1522.) On July 23, 2002, the OEPA responded to Mr. Breen's proposals. It instructed, among other things, that the testing of Lot 42's soil was to conform with "U.S. EPA analytical methods," and that, if it did not, "split sampling with Ohio EPA would be required." (ECF No. 116-2 at PageID #753.)

On February 21, 2003, John E. Breen delivered a letter to the OEPA containing the results of soil sampling and chlordane analysis conducted on Lot 42 (the "2003 Report"). (*Id.*) But as the OEPA soon informed Mr. Breen, the results of the 2003 Report were unacceptable "because Buckeye and its consultants implemented [an] unapproved . . . analytical method" used by the

6

Food and Drug Administration, rather than an approved U.S. EPA analytical method. (*Id.*) Thus, according to the OEPA, Buckeye—which by then had changed its name to "BTX Enterprises"— failed to demonstrate that the properties' concentration of pesticides "met . . . acceptable residential risk levels." (*Id.*)

In December 2003, the OEPA conducted two additional soil samplings at the Neighboring Properties. (*Id.* at PageID #754.) Both samplings revealed concentrations of pesticide contamination well above the agency's acceptable risk levels. (*See id.*)

### 3. 2008-2016: Soil Contamination Continues to Exceed Acceptable Risk Levels; The Breens Ignore the OEPA

In June 2008, Specialty conducted more rounds of soil sampling on the Neighboring Properties. (Op. & Order, ECF No. 143 at PageID #3249). Again, testing revealed pesticide concentrations above acceptable risk levels. (*Id.*) In October 2008, the OEPA sent John E. Breen a letter notifying him of this result. (ECF No. 119-1 at PageID #1493.) It did not receive a response. (Affidavit of Deborah J. Strayton, ECF No. 116-2 at ¶ 9.)

In July 2010, the OEPA sent Mr. Breen another letter, this time notifying him that "[Buckeye's] obligations under the 1992 Orders remained to be performed and that the detected concentrations of site contamination presented a continued threat to human health." (ECF No. 119-1 at PageID #1466.) It further directed Mr. Breen to submit "a work plan for removal of impacted soils at the Neighboring Properties" by September 1, 2010. (*Id.*) This letter, too, went without a response. (Strayton Aff., ECF No. 116-2 at ¶ 10.)

In November 2015, a contractor, on behalf of a prospective developer, collected soil samples from 20 soil-boring locations on lots 39, 40, 42, and 43 of the Neighboring Properties, including samples from the same locations tested in 2008. (Op. & Order, ECF No. 143 at PageID #3250.) Based on its own testing, the contractor concluded the contaminated soil, if excavated,

would not constitute hazardous waste. (*Id.*) Nevertheless, additional testing by the contractor in March 2016 revealed that the concentration of pesticides in the Neighboring Properties' soil exceeded acceptable residential risk levels. (*Id.*)

**4. Relevant Procedural History**

On August 18, 2016, the State filed its ten-count Complaint against the Breens, BTX Enterprises, Inc., Trabue, and Donald Dick. (ECF No. 1.) Count One of the Complaint seeks, under CERCLA § 107(a), to recover from John E. Breen, Janice L. Breen, and BTX Enterprises "all response costs, not inconsistent with the National Contingency Plan, incurred, and to be incurred, by the State associated with the Buckeye Terminix Site facility and Neighboring Properties facility and any migration of contamination from these facilities." (*Id.* at ¶ 90.) Count Two accuses the Breen Defendants of violating Ohio Revised Code §§ 3734.11(A), 3734.13(D), and 6111.07(A) by failing to comply with the 1992 Director's Orders, and thus asks this Court to order the Breens to, among other things, remediate the Neighboring Properties and thereby "complete the work required by the June 1992 Director's Orders." (*Id.* at ¶ 99.)

On January 18, 2019, and with respect to liability only, this Court granted partial summary judgment on (1) Count One against John G. and Janice Breen and (2) Count Two against John G. and John E. Breen. (Op. & Order ECF No. 143 at PageID #3277.) It denied the State's Partial Motion for Summary Judgment (ECF No. 116) in all other respects. (*Id.*)

On March 11, 2019, the Court conducted a one-day bench trial to determine the scope of relief to which the State was entitled on Counts One and Two. (ECF No. 159.) Before this Court rendered an opinion on the matter, the State, as noted, successfully moved to stay all proceedings to facilitate settlement discussions. (ECF Nos. 166, 169.) Between December 2020 and August 2021, that stay was lifted, and the State entered into several consent decrees with the non-Breen

defendants. (ECF Nos. 185, 196, 198.) This left the State's dispute with the Breens as the only live controversy in this case.

## II.

Pursuant to this Court's liability judgment on Count One, the State now seeks reimbursement for $379,531.09 in CERCLA response costs from John G. and Janice L. Breen. As for Count Two, the State asks this Court to "permanently solve . . . the contamination of the Neighboring Properties" by ordering John G. and John E. Breen to excavate and dispose of the contaminated soil thereon. The Breens,[4] for a variety of reasons, oppose both of the State's requests.

### A. **Count One – CERCLA Response Costs**

CERCLA § 107(a)(4)(A), in relevant part, requires "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" to reimburse "all costs of removal or remedial action"—*i.e.*, "response" costs— "incurred by . . . a State . . . not inconsistent with the national contingency plan." The State has already established that John G. and Janice Breen owned the facility where Buckeye dumped hazardous waste (the Site), and that those hazardous substances reached the Neighboring Properties. (Op. & Order, ECF No. 143 at PageID #3263.) It has also established that at least *some* of the OEPA's costs—namely, its "investigatory costs"—qualify as "response" costs. (*Id.* at PageID #3260.) The State has yet, however, to demonstrate that (1) *all* of the costs it seeks to recover constitute "response" costs" and (2) those costs are otherwise consistent with the National Contingency Plan ("NCP"). The Court addresses these issues in turn.

---

[4] For ease of reference, the Court refers to John G. and Janice Breen as "the Breens" in Part II.A. It does the same with respect to John G. and John E. Breen in Part II.B.

### 1. "Response" Costs

At trial, the State produced, among other things, a year-by-year, line-item breakdown of the costs incurred by the OEPA in relation to the Buckeye Terminix Matter from 1992 to 2019 (the "Response Cost Package"). Generally, the expenses fall into three different categories: (1) the direct costs of the agency's investigation, evaluation, and monitoring of the Buckeye Terminix facility (*e.g.*, testing or sampling expenses); (2) administrative costs related thereto (*e.g.*, travel expenses, or time spent by OEPA staff coordinating with private environmental consultants); or (3) time billed by OEPA staff for enforcement-related tasks (*e.g.*, time spent corresponding with the Ohio Attorney General's Office ("AGO") or critiquing draft legal documents). The question at hand is whether the costs generated by these activities qualify as CERCLA "response" costs. If not, then they are, for present purposes, unrecoverable.

CERCLA defines the terms "respond" or "response" to include any "removal, remedy, and remedial action," as well as any "enforcement activities related thereto." 42 U.S.C. § 9601(25). The statute defines a "removal" action to include, among other things,

> such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). Simultaneously, it defines a "remedial action" to include:

> actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or

replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

42 U.S.C. § 9601(24).

All of OEPA's monitoring- or enforcement-related activities—as well as any administrative activities related thereto—are "part and parcel" of the agency's efforts to remediate the Buckeye Terminix facility, and, thus, fall within the scope of at least one (or both) of these terms. *See Vill. of Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004) ("Monitoring and evaluation costs may be recovered as 'removal' costs under CERCLA if they were reasonable, and the activities were not scientifically deficient or unduly costly.") (citations omitted); *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1503 (6th Cir. 1989) (finding that the United States Environmental Protection Agency's (the "EPA") "indirect administrative costs" were generally recoverable because they were "part and parcel of all costs of the [agency's] removal action"). In other words, they qualify as "response" costs. *See* 42 U.S.C. § 9601(25). The Breens make no discernable argument otherwise.

Whether these costs were consistent with the NCP, however, is a separate issue.

**2. NCP Consistency**

When a state brings a cost-recovery action under § 9607(a)(4)(A), the parties "responsible" for those costs—here, John G. and Janice Breen—bear the burden of showing that the state's response activities were inconsistent with the NCP. *Meyer*, 889 F.2d at 1508; *accord United States v. Odabashian*, No. 95-2361 G/BRE, 2005 WL 742287, at \*4 (W.D. Tenn. 2005); *Sherwin-Williams Co. v. City of Hamtramck*, 840 F. Supp. 470, 474 (E.D. Mich. 1993) (citation omitted). Such entails a showing that the state's actions were "arbitrary and capricious or otherwise not in accordance with the law." *Odabashian*, 2005 WL 742287, at \*4 (citing 42 U.S.C. § 9613(j)(2);

11

*Meyer*, 889 F.2d at 1508; *United States v. Akzo Coatings of Am.*, 949 F.2d 1409, 1424 (6th Cir. 1991)). This deferential standard is predicated on the idea that agencies like the OEPA are "better equipped to decide how best to remediate a contaminated site than are courts with limited resources." *See id.* (citation omitted). To that extent, it encourages the examining court "not to substitute its judgment for that of the agency." *Id.*

The Breens, for their part, do not ask this Court to question the State's technical wisdom—only its legal strategy. In their view, the State is not "entitled to any CERCLA recovery whatsoever" because it seeks reimbursement for activities related to the "pursuit of injunctive relief," a remedy they argue CERCLA does not permit. (ECF No. 163 at PageID #3394.) The Breens additionally contend that the State, at this particular moment, is ineligible to recover its response costs under the 1992 Director's Orders because (1) it has yet to formally "demand" payment, and (2) the OEPA "expressly waived any right to seek duplicate damages under CERCLA" in the Orders. All of these arguments lack merit.

### i. Costs Related to the State's Pursuit of Injunctive Relief

The Breens' first argument, as the State partially notes, is both irrelevant and inaccurate. As an initial matter, and as discussed above, a significant portion of the response costs sought by the State stem from activities *other* than its pursuit of injunctive relief—namely, its direct oversight and monitoring of the Buckeye Terminix facility. The Breens' position fails to make this distinction. Nor does it recognize that the State's claim for injunctive relief is made pursuant to Ohio law, *not* CERCLA. (*See* Complaint, ECF No. 1 at ¶ 99.) Thus, whether or not CERCLA provides an injunctive remedy is immaterial.[5]

---

[5] For what it is worth, CERCLA *does*, contrary to the Breens' broad assertion otherwise, authorize injunctive relief in certain circumstances. Section 106, for example, empowers the United States Environment Protection Agency to "initiate an injunctive abatement action if it finds an 'imminent and substantial endangerment to the public health or welfare or the environment.'" *Atlantic Richfield Co. v. Christian*, 140 S. Ct. 1335, 1353 n.7 (2020). And to the extent

ii. *"Demand" Argument*

Even if the response costs sought by the State are otherwise reimbursable under CERCLA, the Breens assert they are "barred and/or mitigated" by the fact the OEPA "never issued a demand for payment at any time in the past 25 years -- or ever." (ECF No. 163 at PageID #3395, 3397.) They base this argument on a mixture of the 1992 Director's Orders' reimbursement provision (Section VIII) and the testimony of OEPA fiscal officer, Terri McCloskey. According to Ms. McCloskey—who tracked the OEPA's Buckeye Terminix-related expenses and arranged the Response Cost Package—once the 1992 Director's Orders came into effect, the OEPA periodically updated the Breens via letter on the amount of response costs the agency incurred. These "informational invoices," Ms. McCloskey noted, gave the Breens the "option" to pay the OEPA's response costs as they accrued. They did not, however, obligate (or purport to obligate) the Breens to make any payments.[6]

The Breens, seizing on the optionality of the OEPA's "informational invoices," argue that Section VIII of the Director's Orders—which requires the Breens to pay the agency's "oversight and response costs in connection with the Facility" after, *inter alia*, they receive an "accounting of these costs" from the OEPA—bars them from having to pay the State anything. (ECF No. 116-2 at PageID #814.) To them, the Orders' reference to an "accounting" really means that the agency must issue a formal, "pay-us-or-be-sued" demand to even be eligible for reimbursement. Because

---

said action constitutes a "response," CERLCA's plain language renders the "enforcement" costs associated with it are recoverable. *See* 42 U.S.C. § 9601(25) (classifying any "enforcement activities related" to a "removal, remedy, and remedial action" as a "response").

[6] As Ms. McCloskey further noted, the OEPA stopped sending these "informational invoices" once they started to come back "undeliverable as addressed."

that apparently has yet to happen,[7] the Breens argue the State's response costs "are not even due at this time." (ECF No. 163 at PageID #3397.)

But the Breens' argument is fatally selective. As the State notes, Section XI of the Order—the "Reservation of Rights" section—reserved the OEPA "the right to take any enforcement action, *recover costs, or seek damages* for injury to natural resources pursuant to any *available legal authority* for [(1)] past, present, or future violations of ORC Chapters 3734 or 6111, [(2)] conditions at the Site or Facility, or [(3)] releases of hazardous wastes or substances." (*See* ECF No. 116-2 at PageID #816) (emphasis added). CERCLA § 107(a) falls within the scope of "any legal authority." So, § 107(a)'s provisions—not the 1992 Director's Orders—presently dictate the State's ability to recover its "response" costs. And the Breens do not (indeed, cannot) point to any part of § 107(a) that requires a government actor like the State to issue a formal, pre-suit demand for payment to succeed in that endeavor.[8]

### iii. "Waiver" Argument

The Breens' third and final argument—that the State "expressly waived any right to seek duplicate damages under CERCLA" in the 1992 Director's Orders—fails for essentially the same reasons as its second argument. Again, the OEPA reserved the right to bring the cost-recovery action now before this Court in the 1992 Director's Orders. The Breens' waiver argument fails to acknowledge this. It also appears to be based on an incorrect belief that the State presently seeks double recovery for its "response" expenditures. That, however, is plainly not the case. (*See* ECF

---

[7] The 1992 Director's Orders do not define the requisite conditions of an "accounting." And if all the term requires is a "pay-us-or-be-sued" demand coupled with a specified list of expenditures, it is unclear why an *actual lawsuit* demanding the payment of a specific costs does not suffice.

[8] The only mention § 107(a) makes of a "demand" is in relation to the recovery of pre-judgment interest, not the recovery of a claimant's response costs themselves. *See* 42 U.S.C. § 9607(a)(4)(D) ("The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned.")

No. 164) (noting that the State solely seeks "a one-time reimbursement" of its CERCLA response costs).

### iv. Conclusion

Traditionally, inquiries into the consistency of a federal or state agency's "response" costs focus on the degree to which those expenses comport (or do not comport) with NCP guidelines. *See, e.g.*, *E.P.A. By and Through United States v. TMG Enterprises, Inc.*, 979 F. Supp. 1110, 1127 (W.D. Ky. 1997). The Breens, however, have gone a different route, challenging the basic propriety and timeliness of the State's recovery action. None of their arguments is fruitful. Thus, they have failed to carry their respective burden. That means, under Count One, and pursuant to CERCLA § 107(a)(4)(A), that the State has sufficiently established its entitlement to $379,531.09 in "response" costs. These costs, as both sides acknowledge, may be continuing.

## B. **Count Two – Injunctive Relief**

Based on this Court's grant of summary judgment on Count Two, the State now seeks an order requiring John G. and John E. Breen to permanently remediate the Neighboring Properties by removing (or "excavating"), disposing of, and replacing all of the contaminated soil that currently exceeds the OEPA's "residential use standards" located thereon. (ECF No. 162 at PageID # 3390.) The State, as noted, argues it is statutorily entitled to such a remedy under Ohio law—namely, R.C. § 3734.10. (*Id.* at PageID #3384.)

### 1. R.C. § 3734.10

Section 3734.10, in relevant part, requires

[t]he attorney general . . . upon request of . . . the director of environmental protection, [to] bring an action for injunction against any person who has violated, is violating, or is threatening to violate any section of this chapter, rules adopted under this chapter, or terms or conditions of permits, licenses, variances, or orders issued under this chapter.

R.C. § 3734.10.

Once a violation of "orders issued under [Chapter 3734]" is established, R.C. § 3734.10 *requires* the presiding court to "grant preliminary and permanent injunctive relief." *Id.* (stating that "[t]he court . . . in which an action for injunction is filed has the jurisdiction to and *shall* grant preliminary and permanent injunctive relief upon a showing that the person against whom the action is brought has violated . . . rules adopted [under any section of Chapter 3734]") (emphasis added); *State of Ohio ex rel. DeWine v. Superior Fibers, Inc.*, Case No. 2:14-cv-1843, 2015 WL 5729373, at *4-5 (S.D. Ohio Sept. 30, 2015) (granting injunction pursuant to R.C. § 3734.10 against two defendants after finding requisite statutory elements established); *State of Ohio ex rel. Ashworth*, 4th Dist. No. 11CA16, 2012-Ohio-5632, ¶ 62 (finding, under *Ackerman v. Tri-City Geriatric Health Care, Inc.*, 55 Ohio St.2d 51, 378 N.E.2d 145 (1978), that the trial court "had to issue an injunction once the statutory requirements [of R.C. § 3734.10] were fulfilled"). The traditional tenets of an action for equitable relief—such as impending threat of "irreparable injury"—need not be proven. *Ackerman* at 56.

R.C. § 3734.10 is, as the State notes, silent on the scope of injunctive relief that it authorizes. *See Ashworth* at ¶ 63 (citing *Adkins v. Boetcher*, 4th Dist. No. 08CA3060, 2010-Ohio-554, ¶ 35). Generally, the remedy fashioned must only be "reasonable under the circumstances." *State of Ohio ex rel. Petro v. RSV, Inc.*, 7th Dist. Jefferson No. 03-JE-7, 2006-Ohio-376; *see also Ashworth* at ¶ 63 (applying the "abuse of discretion" standard of review to the trial court's grant of an injunction under R.C. § 3734.10). In that light, Ohio's courts "ordinarily . . . retain broad discretion to fashion the terms of an injunction" under the statute. *Ashworth* at ¶ 63.

### 2. The State is Entitled to Injunctive Relief

The State has already established that John G. and John E. Breen violated the 1992 Director's Orders—which were "issued under" Chapter 3734 of the Ohio Revised Code—by ignoring the OEPA once it became clear the Interim Remedy failed. (*See* Op. & Order, ECF No. 143 at PageID #3267-71.) Thus, under R.C. § 3734.10, the State is entitled to at least some degree of injunctive relief. What is less apparent, however, is whether the scope of relief sought by the State—removal of the Neighboring Properties' contaminated soil—is warranted. The Court, accordingly, turns to the arguments at hand.

### 3. Soil Removal as a Proposed Injunctive Remedy

The State offers several reasons why the Breens should be required to remove and dispose of the Neighboring Properties' contaminated soil. Paramount among these are the long-term public health risks posed by allowing the soil to remain in place. The State highlights, specifically, the testimony of Brian Tucker—the OEPA's lead technical risk assessor—and OEPA site coordinator Robin Roth, both of whom noted at trial that: (1) the pesticide contaminants dumped on the Neighboring Properties—which are "potent" carcinogens—do not degrade easily; and (2) all of the remediation strategies attempted thus far have failed. These observations are reinforced by a 2017 sampling of the Neighboring Properties' soil, which found a concentration of pesticides ranging between "50 and 200 times" the OEPA's acceptable standard for residential areas.

Separately, the State points to the terms of the 1992 Director's Orders, which (1) have not terminated, and (2) bound the Breens to remediate the Neighboring Properties at the OEPA's direction. (*See* Ex. 5, ECF No. 116-2 at PageID #818) ("The provisions of these Orders shall be satisfied when Respondent demonstrates in writing and certifies to Ohio EPA's satisfaction that

all activities required under these Orders (*including any additional tasks which OEPA determined to be necessary in accordance with the provisions of these Orders and payment of oversight costs*) have been completed and Ohio EPA approves such certifications in writing.") (emphasis added); (*see also id.* at PageID #822, 827) (noting that, after Buckeye took "interim actions . . . to further characterize the extent of pesticide and volatile organic compounds in soils and ground water . . . appropriate remedial measures will be taken, as approved by the OEPA," and that "the time frame for implementation of remedial actions is not provided since these actions are functions of agency approval and magnitude of required remedy").

The Breens, in response, point out they have already implemented "a variety of agreed remedies"—namely, the Interim Remedy—and assert that when the 1992 Director's Orders came into effect, "[t]here was universal consensus that the pesticides would degrade over time." (ECF No. 163 at PageID #3339.) In their view, the State has unfairly flipped the script. And its justification for doing so, as the Breens put, is based on a "speculative" and "virtually frivolous" risk assessment. For these reasons, the Breens argue, excavation is simply unwarranted. If anything, they assert, erecting a fence around the contaminated region of the Neighboring Properties would be enough to fix the problem.

### i. Past Remedial Efforts

The Breens' first point, while unpersuasive, is not off-base. The record reflects that, by the mid-1990s, the OEPA thought—or, at the very least, hoped—the Interim Remedy would be enough to mask the Neighboring Properties' contamination until it naturally degraded to a safe level. But it was wrong. The remedy failed.[9] So too did a "natural attenuation" strategy. So, the

---

[9] As Mr. Roth testified, the Interim Remedy's staple piece—a soil cover—"eroded or was not consistently maintained, as test results in the early 2000s and into 2017 showed contamination at depths shallower than two feet." (ECF No. 162 at PageID #3386.)

contamination persists. And the OEPA, under the 1992 Director's Orders, has the explicit authority to require the Breens to address that problem until it is resolved. (*See* ECF No. 116-2 at PageID #818, 822, 827.) That is why the State now seeks to have the Breens remove the soil entirely. It is also why the Breens' unsuccessful remedial efforts have virtually no bearing on the *current* appropriateness of the State's proposed remedy.

### ii. The OEPA's Risk Assessment

The Breens' second point—that the OEPA's risk assessment is too "speculative" to justify excavation—is also unpersuasive. The Breens base this contention on the fact Mr. Tucker, who conducted the assessment, testified that he was unaware of anyone who has actually been exposed to the Neighboring Properties' contamination. As the Breens put, Mr. Tucker's risk assessment was merely based on the "hypothetical possibility that harm could occur only under hypothetical circumstances – specifically, where there were 100,000 human exposures" to the Neighboring Properties' contamination. It ignored, in their view, the fact the contaminated lots are "densely wooded," that the "surrounding street is a gated community," and that "the lot line with [the Site] has a fifteen foot fence." (ECF No. 163 at PageID #3401.) To that extent, the Breens argue, the State's rationale for its proposed remedy is wholly insufficient.

Mr. Tucker performed two separate risk assessments in relation to the Neighboring Properties. The first assumed that the contaminated lots would be used for the residential purposes; the second assumed that trespassers—*e.g.*, adolescents who live in the surrounding residences—would find their way on to the properties. Both of these assumptions were reasonable. There is no dispute that the Neighboring Properties are "surrounded by residences and are the only undeveloped lots in the area." (Expert Report of Brian Tucker, Ex. 9, ECF No. 116-2 at PageID #869) (hereinafter the "Tucker Report"). Nor is it disputed, as Mr. Roth testified, that multiple

developers have notified the OEPA of their interest in building on the lots. It is thus plausible—or even likely—that portions of the Neighboring Properties will one day soon be put to residential use, or that nearby residents will find their way on to the contaminated lots. This is so regardless of the fact the properties have yet to be developed, or the fact Mr. Tucker has not himself seen a trespasser enter the properties.[10]

As Mr. Tucker testified, the OEPA's standard method for evaluating what is and is not an "acceptable" level of carcinogenic contamination is estimating how many additional cases of cancer a particular contaminant would cause per 100,000 human exposures. This figure, he explained, does not assume that a hundred thousand people *will* come into contact with a piece of contaminated land. Nor does it necessarily mean that "X" exposures must occur in order for a contaminant to cause an additional "Y" number of cancer cases. It solely expresses "the probability of excess cancer risk" posed by a particular environmental hazard. In other words, the higher the number, the more carcinogenic the hazard probably is.

For the OEPA—as with most other state environmental protection agencies—the "acceptable" level of carcinogenicity is, per Mr. Tucker, one cancer case per one-hundred-thousand exposures. Any environmental hazard with an "excess cancer risk" above that threshold exceeds the OEPA's "risk goal," and thus warrants remediation. Here, both of Mr. Tucker's risk estimates exceeded this threshold—his residential analysis vastly so.[11] And as the State contends, and the Court agrees, such captures the significant carcinogenic risk posed by the Neighboring Properties' contaminated soil.

---

[10] A central purpose of the OEPA is to remedy environmental hazards *before* they manifest public health issues–not after. To do so, it must, as Mr. Tucker put, (1) assess the facts before it, (2) hypothesize how probable it is that certain events will occur, and (3) assess the overall public health risks those events pose. That is what the OEPA did here.

[11] In his "residential" risk assessment, Mr. Tucker determined that, as of 2017, the "Total Estimated Cancer Risk" posed by the Neighboring Properties' contaminated soil ranged from fifty to two-hundred additional cancer cases per one hundred thousand exposures. *See* Tucker Report at 12. In a "trespassing" scenario, Mr. Tucker estimated that the properties risked causing an additional three-to-five cases of cancer per one hundred thousand exposures. *Id.*

### 4. Removal of the Soil is Warranted

The Breens, as noted, argue that an order requiring them to fence off the contaminated areas of the Neighboring Properties would, for present purposes, be sufficient. The State begs to differ. In its view, a fence would, in comparison to an excavation order, constitute an inadequate long-term remedy, as it would: (1) require long-term maintenance and upkeep that excavation would not; (2) need to be constructed in a such a way as to prevent contaminated runoff material from escaping its bounds; and (3) be unlikely to stop a determined trespasser from scaling it. And given the protracted nature of this case, a permanent remedial measure is, the State asserts, more than due.

Ultimately, the Court agrees with the State. Even so, it must acknowledge that the circumstances surrounding the parties' arguments have changed. Specifically, after the Court lifted its stay of proceedings in this case, the State entered into a consent decree with Defendant Trabue (the owner of Neighboring Properties) which, among other things, requires Trabue to (1) erect and maintain a six-foot iron fence around the properties' contaminated regions and (2) conduct further soil sampling (the "Consent Decree"). (*See* Consent Decree, ECF No. 198); (Ex.'s A-1, A-2, B, ECF No. 198-1.) This means the State has effectively bound another, non-Breen defendant to implement the Breens' proposed remedy. The overriding question, then, is whether the remedy sought by the State—excavation of the Neighboring Properties' contaminated soil—is warranted in light of this development.

The answer, in this Court's view, is "yes." Thirty years after being dumped, the pesticides in the Neighboring Properties' soil remain at dangerously high levels. The State has presented ample, unrebutted evidence that those contaminants are unlikely to degrade to residentially acceptable levels any time soon. All of the concerns raised by the State regarding the long-term

21

efficacy of a fence are thus applicable. Trabue's fence, in other words, may function as a stop-gap remedy for the State's exposure concerns. But there is certainly no guarantee that it will be a permanent fix.[12] And here, the Court is persuaded that the most appropriate remedy for John G. and John E. Breens' violation of the 1992 Director's Orders—which prolonged an already protracted remediation process—is a permanent one.

Thus, pursuant to R.C. § 3734.10, and in light of the evidence and arguments presented at trial, the Court **ORDERS** John G. and John E. Breen to remediate the Neighboring Properties by removing, disposing of, and replacing with clean fill all of the contaminated soil located thereon which currently exceeds the OEPA's "residential use standards," subject to the following conditions and deadlines:

1.    Within thirty (30) days of the date of this Opinion and Order, the State shall file a status report with the Court which summarizes (a) any new soil sampling data that the OEPA acquired since the March 11, 2019, bench trial; and (b) whether, and to what extent, additional evaluation of the Neighboring Properties' contaminated soil is needed to ascertain its location and amounts exceeding residential use standards.

2.    Within ninety (90) days of the date the Update is filed, John G. and John E. Breen shall (a) pursuant to Section VI of 1992 Director's Orders, and to the extent such agreement(s) do not already exist, obtain voluntary access agreements with the present owner(s) of the Neighboring Properties; and (b) submit for OEPA review and approval a written document (the "Scope of Work") containing the following:

---

[12] Nothing in the Trabue Consent Decree indicates that the fence is intended to serve as the final remedy for the Neighboring Properties' pesticide contamination. (*See* Consent Decree, ECF No. 198.) Nor has the State given this Court any inkling that it no longer seeks to have the Neighboring Properties' contaminated soil removed.

i.      An assessment of any gaps in existing sampling data as to the lateral and vertical depth of pesticide contamination in the Neighboring Properties' soil, as needed to determine the location and amount of soil contamination that exceeds residential use standards;

ii.     Estimations of the area requiring removal to achieve residential use standards, the quantity of soil to be removed, and the cost of removal; and

iii.    A description of how they intend to remove, dispose of, and replace with clean fill the Neighboring Properties contaminated soil (the "Removal Plan").

3.      Within forty-five (45) days of the OEPA's approval of the Scope of Work, John G. and John E. Breen shall establish an environmental covenant with the owner(s) of the Neighboring Properties and the OEPA's Director prohibiting the extraction and use of ground water at or underlying the Neighboring Properties. The environmental covenant is to include provisions for notice of the prohibition and submission of annual compliance reports to the OEPA by a central management entity. Prior to any sale or transfer of the Neighboring Properties, the environmental covenant is to be filed at the Franklin County Record's Office for recording in the same manner as a deed for the property.

4.      Within ninety (90) days of the OEPA's approval of the Scope of Work, John G. and John E. Breen shall, consistent with the Removal Plan, remove, dispose of, and replace with clean fill all of the contaminated soil exceeding the OEPA's residential use standards which remains on the Neighboring Properties (the "Removal").

5.      Within thirty (30) days of the Removal's completion, John G. and John E. Breen shall notify (a) the OEPA site coordinator assigned to the Buckeye Terminix matter and (b) this Court that the Removal has occurred (the "Notice"). Within thirty (30) days after said filing occurs,

the State shall file a status report which documents whether any live controversy remains in this case.

6.      At any point, John G. and John B. Breen may, for good cause, submit to the OEPA for approval a request for an extension of any time period or deadline stated herein. Any such extension granted by the OEPA shall not be considered a violation of this injunctive order, and any other deadlines or time periods for compliance with this order shall be extended as necessary.

### III.

For the foregoing reasons, the Court: (1) finds John G. and Janice Breen liable for $379,531.09 in CERCLA response costs, which are continuing; and (2) orders, pursuant to R.C. § 3734.10, John G. and John E. Breen to remediate the Neighboring Properties in the manner set forth above.

The case shall remain open.

**IT IS SO ORDERED.**

**7/7/2022**                                              **s/Edmund A. Sargus, Jr._____**
**DATE**                                                    **EDMUND A. SARGUS, JR.**
                                                              **UNITED STATES DISTRICT JUDGE**

24